RIFE *v.* GAFILL OIL CO.

1. EXPLOSIVES — NEGLIGENCE—KEROSENE—STATE INSPECTOR'S CERTIFICATE OF APPROVAL.

In an action against an oil company for the death of plaintiff's wife, alleged to have been caused by the explosion of a can containing a fluid purchased as kerosene from defendant, where the defense was immunity because of inspection and approval by the State inspector, *held*, that while the inspector's certificate of test and approval is protective evidence that the kerosene was up to legal standard of safety when inspected and released for sale as such, with a permissible presumption that if uncontaminated it would continue so, it is not conclusive evidence that it did.[1]

2. EVIDENCE—RES GESTÆ.

Where an explosion occurred inflicting painful and mortal injuries, the statement of the injured person, who was in no condition to premeditate or purposely formulate an untruth, made within 15 or 20 minutes after the explosion, that the lamp exploded, was admissible, under the circumstances, as part of the *res gestæ*, in an action to recover for said injuries.[2]

3. EXPLOSIVES—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

Evidence of the cause and nature of the explosion,. direct and inferential, *held*, sufficient to carry that question to the jury.[3]

4. SAME—EVIDENCE—TESTIMONY AS TO TESTS ADMISSIBLE.

Where plaintiff purchased the kerosene on June 28th, the explosion occurred on June 30th, and it was shown that no kerosene was unloaded into defendant's storage tank between June 19th and July 19th, testimony as to tests by a State inspector of kerosene taken from defendant's storage tank on July 10th, when the supply was low, was admissible.[4]

[1]Explosives, 25 C. J. § 45 (Anno); [2]Evidence, 22 C. J. § 551; Explosives, 25 C. J. § 39; [3]Id., 25 C. J. § 46; [4]Id., 25 C. J. § 42 (Anno).

5. SAME — KEROSENE — GASOLINE — DUTY OF DEALER TO PREVENT MIXTURE.

> The law imposes a high degree of care upon dealers selling such combustible commodities as kerosene and gasoline to prevent their mixture.[5]

6. SAME—NEGLIGENCE—KEROSENE—NOTICE OF EXPLOSIVE CHARACTER—QUESTION FOR JURY.

> Testimony that defendant oil company had notice that other quantities of the same supply as that sold to plaintiff were below legal test, explosive, and dangerous to use for lighting purposes, was sufficient to carry the question of its negligence to the jury.[6]

Error to Cass; Warner (Glenn E.), J.    Submitted June 9, 1925.    (Docket No. 66.)    Decided June 7, 1926.

Case by Lawson Rife against the Gafill Oil Company for the negligent killing of his wife.    Judgment for plaintiff.    Defendant brings error.    Affirmed.

*Shively & Gilmer* and *J. S. Council* (*Gore & Harvey*, of counsel), for appellant.

*Walter C. Jones* (*Asa K. Hayden*, of counsel), for appellee.

STEERE, J.    In 1924 plaintiff was a farmer living with his family between two and three miles from Dowagiac in Cass county, and used kerosene lamps for lighting his home.    On June 30, 1924, his wife was killed in their home by explosion of a can partially filled with a fluid purchased by him as kerosene from defendant at its filling station in Dowagiac.    Defendant is a corporation dealing in oil products, including gasoline and kerosene.    It maintains large storage or supply tanks at Niles, which are filled from tank cars, and from there delivers its product in tank trucks to its filling stations and customers who buy in quantity

---

[5]Explosives, 25 C. J. § 12 (Anno); [6]Id., 25 C. J. §§ 45, 46.

throughout the territory it covers.    Plaintiff brought this action in tort to recover damages for the death of his wife, charging that defendant—

"negligently and carelessly and without notice or warning sold and delivered to the plaintiff kerosene which was not pure kerosene, in this that said kerosene was below the standard and requirement imposed by law for the sale of pure kerosene, was mixed with gasoline or other inflammable and combustible substances or gases, was diluted with other dangerous substances not known to the plaintiff, was sold and delivered to the plaintiff in a can not painted red and without any other notice or warning of any kind of its dangerous inflammable and combustible tendency, that said kerosene would and did give off a combustible vapor below that required by law."

Defendant pleaded issuably in denial.    Trial by jury resulted in a verdict and judgment in plaintiff's favor for $1,000.

Defendant seeks review and reversal on numerous assignments of error, the one most strenuously urged being that a verdict should have been directed in its favor as requested, because the kerosene it sold plaintiff was of standard quality, had been duly inspected, tested and approved by an oil inspector for the State department of public safety, and there was no competent proof that it had been adulterated by defendant with any admixture of gasoline or other explosives.

Defendant's claim of immunity because of inspection and approval by the State inspector cannot be taken as conclusive under the circumstances of this case. The testimony showed defendant had at its plant in Niles six storage tanks located on a railroad siding, five for storage of gasoline and one for kerosene, the latter being of 20,000 gallons capacity partitioned into two tank compartments of about 10,000 gallons each. Its stand pipes for unloading both kerosene and gasoline are located so near each other that either liquid

235—Mich.—2.

can be pumped into any of the storage tanks from a tank car standing in one position on the siding. Both its gasoline and kerosene are purchased in the open market and are delivered on the siding at its Niles plant in tank cars of from 7,000 to 9,500 gallons capacity which are not distinguishable in construction, color or shape, the distinction in contents being, as defendant's agent testified, "When gasoline and kerosene is received at our office, each is marked with 'inflammable' cards on all gasoline." The tank wagons, or trucks, by which delivery is made to garages, filling stations and other places of distribution throughout the district have steel tanks upon them with partitions "in which they carry gasoline and kerosene, fuel oil."

Defendant unloaded but two cars of kerosene at Niles during the month of June, 1924. One was received and spotted on June 9th and the other on June 19th. These two car loads were inspected and tested by a State inspector and certificates of approval given, before the cars were unloaded into the storage tank, which was done shortly thereafter. No kerosene had been put into the storage tank by defendant between June 19th and July 10th, when a State inspector secured a sample from each department in the storage tank at Niles, one of which was nearly empty and the sample from it blew on explosive or flash test at 100. Samples from surrounding filling stations and stores which on July 10th had on hand kerosene received from defendant's Niles storage were found on flash test in room temperature to emit an explosive vapor at from 85 to 100. The Michigan legal test is over 120. While the inspector's certificate of test and approval is protective evidence that the kerosene was up to the legal standard of safety when inspected and released for sale as such, with a permissible presumption that if uncontaminated it would continue so, it is not conclusive evidence that it did.

The story of the accident in outline is that on Saturday afternoon, June 28, 1924, plaintiff went to Dowagiac and while there purchased at defendant's filling station two gallons of kerosene which was put into a five-gallon oil can and taken home by him. That evening he let a married son have a gallon of it and filled a small flat-bottomed glass hand-lamp in general use in his home with some of it. This lamp was used on that and the next evening, and taken by plaintiff and his wife to their room upstairs when they retired. On Monday morning, June 30, 1924, he as usual arose about 4 o'clock, went down to the kitchen taking the lighted hand-lamp with him and put it on the kitchen table which was approximately four feet from the stove. He then busied himself for a time building a fire in the stove, filling and putting on the teakettle, etc. In about half an hour, as he thought, he called his wife. When she came down there was a good fire burning in the stove. He talked with her a short time, then said he would go out and do some hoeing till breakfast was ready and went there for that purpose. He was working a few rods from the house hoeing in the garden when he heard what he called a "double sound," or two explosions in quick succession one heavier than the other, and hurried back to the house where he met his son carrying his mother out of the kitchen with her clothing in flames and nearly burned off. After standing over his wife for a moment he ran to a near-by neighbor's where there was a telephone and had him call a doctor. When plaintiff left the kitchen but a short time before, the burning hand-lamp was yet setting on the table, his wife was getting the breakfast, and the oil can was on the floor just across the corner of the room from where the lamp sat on the table, and but a few feet from the stove.

Their son, Edward, who was sleeping upstairs,

testified that he heard two explosions and jumping. up ran downstairs without dressing to the kitchen where he found the room filled with a blaze and his mother lying under the edge of the table with her clothing all on fire. He seized her in his arms and ran out of the door with her, and was quite painfully burned himself. While curtains, paper, etc., were burned up in the kitchen, the woodwork did not catch fire and the conflagration was soon extinguished. Within 15 or 20 minutes he carried his mother into the house and as he laid her down on the couch she said: "The lamp exploded."

The doctor who had been sent for responded promptly as possible and testified he found Mrs. Rife lying on a couch in the house suffering; her hair and clothing had been burned off, there were serious burns over her face, and practically her whole body. She was moaning and making other manifestations of pain, the only words she spoke being in regard to her suffering. He dressed her burns and did what he could to relieve her. She died before 1 o'clock that day, and he gave as the cause of her death "the shock from the burns she sustained."

An examination of the kitchen not long after the explosion disclosed that the curtains and other like combustible material in the room had been burned, the glass in some of the windows of the room had been blown out and in others broken, the kitchen stove had not been disturbed in any way, the fire was yet burning in it and its lids were all in place. The small glass lamp left on the table was found on the floor broken in pieces, one piece being yet on the table. The bottom of the oil can was blown off, its filling cap on top was yet in place but the stopper for the end of the spout was off.

The most direct evidence of how the explosion occurred is the son's testimony as to what his mother said

when he carried her into the house within 15 or 20 minutes after the explosion and laid her upon the couch. This testimony was timely objected to by the defense as incompetent and its admission is assigned as highly prejudicial error, while it is claimed for plaintiff that her brief exclamation "The lamp exploded" constituted under the circumstances a part of the *res gestæ* and was therefore admissible.

During the interval between the explosion and statement testified to, deceased was suffering in the agony of a painful and mortal injury resulting from a startling incident, apparently in no condition to premeditate or purposely formulate an untruth. If, as she said, the lamp exploded, it would be the first fact coming within her normal field of consciousness in connection with the disaster which followed, leaving her in the painful and alarming condition shown, with death impending. We think it fairly appears that those words were in their nature a verbal act and part of the *res gestæ,* clearly admissible under the rule on that subject in *Stone* v. *Sinclair Refining Co.,* 225 Mich. 344. There was sufficient evidence of the cause and nature of the explosion, direct and inferential, to carry that question to the jury.

Defendant's objection to testimony of tests made by a State inspector after the explosion, about July 10th, is not tenable. It was shown no kerosene had been unloaded into defendant's kerosene storage tank at Niles between June 18th or 19th and July 19, 1924, and that on July 10th when the samples were taken from it the supply was low. Other samples tested about that time and found below the legal flash test were traced to the same source.

Defendant was handling, selling and delivering to the public in the same delivery trucks both kerosene and gasoline. The high degree of care which the law imposes on those dealing in such combustible com-

modities has been often emphasized by this and other courts (*Stowell* v. *Standard Oil Co.*, 139 Mich. 18; *McLawson* v. *Paragon Refining Co.*, 198 Mich. 222). There was abundant evidence that other quantities of this same supply sold to the public were below legal test, explosive and dangerous to use for lighting purposes, and that notice of this had reached defendant through its employees or agents. A witness named Ross Coller, connected with a daily paper, visited the Rife home on the day of the accident, and testified that on his return to town he called at the Gafill oil station where he talked about it with the manager there named Young, who in the course of their conversation told him they had received complaints about their kerosene being too flashy and he had called up the Gafill Oil Company at Niles and reported it to them, telling the witness in substance:

"We have had some complaint about our kerosene. It was pretty flashy. One of our customers last week brought back the can of kerosene and thought we had given him gasoline, and we poured out some on the cement walk and touched a match and it flashed."

A witness named William Shott who lived within three miles of Dowagiac testified that he bought three gallons of kerosene at defendant's filling station in that city and after taking it home first had occasion to use a little of it in kindling a wood fire in the stove. When it was touched by a lighted match it exploded, which led him to pour some on a rag and test it outside. Finding it flashed dangerously he poured the rest of it in his automobile tank and used it there. When he went to town the next time he asked the employee at the filling station if "he made a mistake and gave me gasoline instead of kerosene. *Q.* What did he say? *A.* He said, 'No.' He said, 'I give you kerosene, but (he said) it was high test.'"

Plaintiff testified that he had bought kerosene from defendant's filling station at different times during the summer, and found no occasion to suspect any of it until the last purchase before the accident, which he noticed flickered or jumped in the lamp and didn't smell right. They emptied a sample of it outside to test it and it lit with a flash. They then put the rest of it in the Ford and used it there. When he went to town the next Saturday he went to defendant's filling station and asked the man in charge what was wrong with it, to which he replied "It was awful high test oil," several complaints had come to them about it "but that this was all right," and so he bought the two gallons, which resulted in the accident.

The paramount issues of fact in the case were whether defendant was guilty of negligence, whether plaintiff's wife was guilty of contributory negligence and, contingently, the amount of damages. These issues were properly submitted to the jury. The verdict is not shown to be excessive. Upon this record considered in its entirety we find no prejudicial error demanding reversal.

The judgment will stand affirmed.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.

Justice MOORE took no part in this decision.