BLAND Z. RICHARDSON, Plaintiff and Appellant, v. FARMERS UNION OIL COMPANY, a Corporation, Defendant and Respondent.

No. 9339.

Submitted February 26, 1957. Decided May 15, 1957.
Rehearing Denied June 11, 1957.
312 Pac. (2d) 134.

536

Messrs. Maury, Shone & Sullivan, Butte, Messrs. Hoberg & Finger, San Francisco, for appellant.

Messrs. Hoffman & Cure, Great Falls, for respondent.

Mr. H. Lowndes Maury, Mr. John H. Finger, Mr. H. B. Hoffman and Mr. Orin R. Cure argued orally.

MR. CHIEF JUSTICE HARRISON:

Plaintiff, then a first lieutenant in the United States Air Force, in the month of April, 1950, moved his trailer to the Great Falls Air Force Base, commonly called the East Base, where it was parked upon a lot among other trailers belonging to military personnel.

Plaintiff had a wife and two children and they occupied the trailer as their residence. It was heated by means of a Duo Therm heater which was situated near the door entrance on the side of the trailer. This heater had a measuring device to deter-

mine the amount of fuel in its tank, and used burner fuel in its operation. To start the heater a valve was opened, permitting oil to flow from the tank into the burner pot of the heater. The heater, according to the plaintiff, could be ignited in two ways. The usual procedure was to attach a match to the end of a wire, and hold it in the burner pot until a few drops of fuel entered, and in a matter of one-half to one and one-half minutes it would light. The other method was to allow the fuel oil to puddle in the burner pot and hold a lighted match around the edge or close to the burner fuel for a minute or so. In either event the match would heat the fuel to the point where it would vaporize and ignite. Plaintiff testified that if a match was dropped directly into the puddle of burner fuel it would be extinguished.

Fuel for the heater was contained in a fifty-five gallon drum kept outside the trailer. Plaintiff had secured his drum from the base two or three days before he purchased any burner fuel.

Plaintiff also owned a five-gallon can with a flexible spout which was used to convey burner fuel from the drum to the tank on the heater, which can was ordinarily kept outside the trailer in a lean-to.

On June 29, 1950, plaintiff by telephone ordered burner fuel from the defendant, Farmers Union Oil Company. On the same day forty-six gallons were delivered and placed in the fifty-five gallon drum by its employee, Rex Hawn. Plaintiff testified that he was present when the delivery truck came to his premises and made the delivery; that immediately after making delivery to him the truck driver made a delivery to Sergeant Portz who lived next door to him. Portz testified that the delivery of the burner fuel was made to plaintiff first, and that immediately thereafter he received payment and issued a ticket evidencing the delivery and payment. Such tickets were numbered in consecutive order in a book, and the ticket number covering the Portz delivery was 195-T. The truck driver testified he then made delivery to the plaintiff, and the ticket number covering that transaction was 196-T. The defendant's truck driver testi-

fied that he continued to deliver burner fuel to the air base thereafter throughout the balance of that year.

Plaintiff used the burner fuel in his heater thereafter, though he was not sure of the number of times, and never had any trouble with it until October 1, 1950. Sergeant Portz had no trouble whatever with the burner fuel he received at the same time, and admittedly both deliveries were made from the same tank on the delivery truck.

Plaintiff testified that about 5:00 p. m. on September 30, 1950, he and his wife went into town to shop and returned to the trailer about 9:00 p. m. The children were put to bed in sleeping sacks made from blankets and he and his wife.retired to bed using an electric blanket. He further stated that the last time the heater had been on was early in the morning of September 30.

Between 4:30 and 5:00 a. m. on October 1, 1950, plaintiff's wife awakened him and requested him to light the heater as it was cold in the trailer. Plaintiff observed the fuel supply in the heater tank was low. He turned on the valve allowing burner fuel to run into the pan, proceeded outside with the five-gallon can, placed it under the drum and left it to be filled while he stood back inside the door. The outside temperature was 22° F. at 6:00 a. m. on October 1, 1950. Plaintiff estimated the inside temperature of the trailer to be about 30° to 35° F. at that time. He further stated that the temperature of the stove was the same as the trailer, and the temperature of the burner fuel was the same as outdoors. After the five-gallon can had about three to three and one-half gallons in it, he went outside, picked it up and carried it inside, poured about one to one and one-half gallons into the heater tank, closed the lid and set the can down on the floor of the trailer about a foot from the heater.

Plaintiff struck a match and threw it into the heater. Fire shot out the heater door, the flames caught on the side of the heater, ignited the fuel from the can nearby and caused it to explode, saturating him with flaming oil. He received extremely

severe injuries and was hospitalized from that time until September, 1952.

This is a general picture. Other facts developed at the trial will be discussed hereafter in this opinion as they relate to alleged errors contended by plaintiff.

This action was originally brought against the Farmers Union Oil Company and the Phillips Petroleum Company, as defendants, and by his complaint the plaintiff alleged that the defendants sold and delivered to him, contrary to the laws of · the State of Montana then in force, burner fuel with a flash point lower than 150° F. measured by the tag open-cup method; said burner fuel having a flash point of less than 75° F. measured by the tag open-cup method; that the sale of such fuel was unlawful; that if the defendants, or either of them, had used ordinary care to inspect it they would have discovered that the fuel was a dangerous, highly volatile and explosive compound with a flash point lower than 75° F. measured by the tag open-cup method, being the method of testing established by law.

As to the Phillips Petroleum Company, the plaintiff charged negligence in failing to inspect their products, in labeling it "burner fuel," in failing to warn or notify the Farmers Union Oil Company in any manner of the danger to its customers, and in failing to notify the Farmers Union Oil Company of its dangerous, highly volatile and explosive character because it did have a flash point less than 150° F. measured by the tag open-cup method.

As to the Farmers Union Oil Company, the plaintiff charged negligence in that it failed to inspect or test the fuel; in unlawfully selling the same to plaintiff for use as a burner fuel; in negligently labeling it "burner fuel"; in failing to warn or notify plaintiff of the danger of using it; and of its dangerous, highly volatile and explosive character because of its having a flash point less than 150° F. measured by the tag open-cup method.

The defendants denied these allegations, and in general pleaded that the injuries were the sole result of plaintiff's

negligence and carelessness in that the heater in the trailer was in a heated condition; that the plaintiff allowed burner fuel to flow over and upon the heated portions of the heater; that plaintiff well knew, or should have known, that an unlighted and heated fire box will cause burner fuel to vaporize, and that the resulting mixture with air will create a volatile mixture; and that plaintiff in lighting a match ignited the explosive mixture causing his own injuries.

The cause was tried to a jury and at the conclusion of plaintiff's evidence a motion for a nonsuit on behalf of the Phillips Petroleum Company was granted by the court. The case proceeded thereafter against the remaining defendant, Farmers Union Oil Company. At the conclusion of the trial, the cause was submitted to the jury which returned a verdict in favor of the defendant and this appeal followed.

Plaintiff sets forth nineteen specifications of error which in general are divided into three groups, consisting of alleged error in exclusion of evidence offered by the plaintiff; alleged error in the admission of evidence offered by the defendant and objected to by the plaintiff; and alleged erroneous instructions given by the court to the jury at the request of the defendant and objected to by the plaintiff.

We will first discuss plaintiff's specifications of error, 4 to 17, inclusive, and 19, all dealing with offers of proof made by the plaintiff, objected to by the defendant, and such objections sustained by the court. We will further discuss the facts as they apply to these specifications.

The ground safety director of the Great Falls Air Force Base, James L. Dickson, arrived at the trailer approximately 6:45 a. m. on October 1, 1950; he found the gasoline can very much bulged at the bottom and separated from the rest of the container. The fifty-five gallon drum was sitting on the cradle adjacent to the trailer. When he arrived there was a guard at the scene. The guard remained on the premises until the 15th of October at which time the witness Dickson left for a vacation.

He testified that when he returned on October 23rd, the guard was there.

On October 23, 1950, he examined the drum which appeared to be in the same condition as on October 1st. It was a little less than half full. There was a small air vent in the drum about the size of a lead pencil. He then removed a part of the contents and noticed the odor of gasoline; that he drew a sample from the drum, measured the temperature and found it to be 6° C. or approximately 42° F. The drum had a seal on it on October 25, 1950. It remained at the site of the fire until October 1, 1951, at which time it was removed and placed in a vault. Following the withdrawal of the sample on October 23, 1950, offers of proof disclose that the witness thereafter drew various samples from the drum.

Offers of proof were made as to certain tests conducted with these samples, all of which were objected to in general by the defendants, on the grounds that the offered evidence was to establish a state of facts at a time subsequent to the explosion and reverse the presumption that a state of facts once proved to exist continues to exist; that the proper foundation was not laid in that it was not proven that the samples were the same as in the drum on October 1, 1950, or in that same condition, too remote in time, incompetent, irrelevant and immaterial, and that the fuel used in the tests was not identified as the fuel that was there on the day of the explosion.

In discussing these offers it must be borne in mind that the sale of the burner fuel was on June 29, 1950; the drum was outside the trailer at all times until about October 1, 1951; the fuel had been used from the time of purchase up to October 1, 1950, without trouble or complaint, and that the first examination of the drum was not made until October 23, 1950, or more than three weeks after the explosion.

The court expressed its opinion that plaintiff would have to show definitely that it was the same oil that was in the drum on the morning of the explosion. Counsel for plaintiff admitted no one had ever looked inside the barrel, and they could only

rest on inferences in certain matters. With reference to inferences, R.C.M. 1947, section 93-1301-2, provides:

"An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of the law to that effect."

R.C.M. 1947, section 93-1301-4, provides:

"An inference must be founded:

"1. On a fact legally proved; and,

"2. On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature."

It was the contention of the defendants that, inferences do not work backwards, and they relied for authority upon our holding in the case of Doran v. United States Building & Loan Ass'n, 94 Mont. 73, 20 Pac. (2d) 835, 837, wherein we stated:

"If the evidence offered was sufficient to raise the presumption contended for, the position of the plaintiff would be sound. The facts testified to with reference to the condition of the step on January 28, 1931, and [by] the rebuttal witnesses as to its condition on a subsequent date, cannot be made the basis from which the presumption can arise. No presumption is to be inferred from the fact that a condition exists at a particular time that it existed in the past. Presumptions cannot be reversed. They do not operate backwards. * * *

"From one fact found another may be presumed if the presumption is a logical result; but to hold that a fact presumed at once becomes an established fact for the purpose of serving as a basis for a further presumption or inference would be to spin out the chain of presumptions into the barest region of conjecture."

It is apparent from its rulings that the court adopted this as a correct theory of law. While plaintiff contends that this decision is erroneous, we find:

"The presumption of the continued existence of a person, a personal relation, or a state of things is prospective, and not

retrospective. Such a presumption never runs backwards; the law does not presume, from proof of the existence of present conditions or facts, that the same facts or conditions had existed for any length of time prevoously." 20 Am. Jur., Evidence, section 210, page 208.

We have examined many cases from other jurisdictions and ▇ it appears to us that where the inference is permitted to show a previous condition the foundation must show that the substance was in the same state or condition at a time not too remote, and that the nature of the substance is constant. The general rule appears to be:

"Since there is a presumption, * * * of the continued existence of a fact or condition of a continuous nature, it follows that such a fact may, within the limits of relevancy, be shown to have existed at a particular time by proof of its existence at a prior time, and its existence at a subsequent time may be shown where the interval is short as compared with the natural permanent nature of the fact or condition in question. Likewise, the existence, at a particular time, of a fact or condition of a temporary nature may be proved by evidence of their existence at another time, provided it is shown that they did not change during the interval; but, in the absence of such a showing, the evidence is inadmissible." 32 C.J.S., Evidence, section 585, page 439.

Plaintiff contends that with respect to his offers of proof, the length of time elapsing before the examinations were made should not affect the competency of admissibility of such evidence, but merely its weight. He cites People v. Preston, 341 Ill. 407, 173 N.E. 383, 387, 77 A.L.R. 631, a murder case. In that case the tests were made two months after the commission of the crime, and the court stated "The testimony showed that the stains examined were in the same condition as on October 13. The length of time would not affect the competency of the evidence, but only its weight." We find no fault with this principle applied as it was in that case to something obvious, but in this case we are not dealing with something which is obvious be-

cause burner fuel is a petroleum product, and under certain circumstances, as disclosed by the evidence in this case, can become a volatile and explosive substance. Its characteristics can and do vary with climatic changes, passage of time and manner of use.

From the testimony in this case it requires an expert versed in testing petroleum products to ascertain whether or not such burner fuel is in the same or similar condition. The testimony would indicate that no lay person, by observation alone, would be able to state that upon a certain day burner fuel was or was not in the same or similar condition that it was on a prior date. No witness here examined the fuel on the date of its delivery, June 29, 1950, or at any other time previous to the fire, or upon any date immediately following the fire.

Plaintiff asserts that the circumstances of the kind of container the burner fuel was in rebuts the probability or possibility of any interference or placing of contaminating mixture in the fluid. The fluid was contained in a drum which admittedly was in the open air and had a cap on top of the drum through which it could be filled; there was no evidence of any lock of any type upon the cap and there was a vent in the cap that was always open. The drum sat in the same place it was on October 1st until October 23rd when the first sample was drawn from it by Dickson, who does not appear to have been an expert in the field of petroleum analysis so far as the tag open-cup method of testing was concerned. On October 25th Dickson found a seal had been placed upon the drum but did not know who put it on. This would indicate that the drum was not exclusively in the custody of Dickson, as plaintiff maintains, since this very fact indicates that others had access to it.

While the results of whatever tests performed by Dickson upon the sample of the contents of the drum were not admitted by the court, the offer of proof indicates that he would testify the mixture was highly volatile and explosive in his opinion. However, with the knowledge that the witness Dickson then had in October, 1950, he did nothing toward removing the drum from

where it sat in the open air until October 1, 1951, being one year after the explosion and fire, when it was removed to a vault.

While it is true that in the case of Standard Oil Company v. Reagan, 15 Ga. App. 571, 84 S.E. 69, a test was permitted to be shown by one admittedly not an expert that the liquid sold ignited much more readily than genuine kerosene, yet here the plaintiff alleged that the burner fuel had a lower flash point than 75° F. when tested by the tag open-cup method, as provided by the laws of Montana. R.C.M. 1947, section 60-209.

There would be only one way to prove that the burner fuel ██ would have such lower flash point and that would be to prove a test by the statutory method, and the witness Dickson admitted he was not familiar with that method and could not perform such a test. The court was correct in sustaining the objections to the offers embraced in specifications 4, 12 and 13.

Specifications of error 5, 6, 7, 8, 9, 10, 11, 15, 16, 17 and 19 cover rulings by the court with regard to offers of proof covering tests made of samples taken at various times from October 23, 1950, to February 10, 1953. With respect to these offers of proof it is likewise the contention of the plaintiff that where a lapse of time would not materially affect a condition, the subsequent existence of the condition may give rise to an inference that it previously existed, and any intrinsic weakness in such evidence goes to its weight rather than to its admissibility.

As authority for this position the case of Mette & Kanne Distilling Co. v. Lowrey, 39 Mont. 124, 101 Pac. 966, is cited. That case was an action to recover the sale price of barreled whiskey shipped by the seller on October 5th and received and stored by the purchasers in their cellar on October 18th.

The proof showed that the barrels containing the whiskey were received in apparently the same condition as when shipped; that they were put into the purchasers' cellar and stored; that the cellar was kept locked so that no person other than the purchasers and their employees could have access to it, and that after the barrels had remained there a sufficient period of time to allow the whiskey to get in a condition for use they were

opened and found to contain an adulterated liquor of a quality entirely different from the type ordered; that such adulteration could not have been accomplished except at some place where there were facilities for that purpose.

It will be seen that the fact situation in that case differs considerably from this in that there, after transportation by the carrier to the place of business of the purchasers, the barrels were stored in a locked cellar and when opened the adulteration was discovered.

Here we have burner fuel placed in a drum situate in the open air where, except for a wire fence around the premises, it would be accessible to anyone upon the premises, and following the fire it remained in the open air for a year before it was placed in any type of security. No immediate steps were taken to test the contents of the drum, the first sample being taken therefrom on October 23rd, and no test made at that time to determine the flash point in accordance with the method approved by the Montana statutes. Section 60-209, supra.

Dickson testified that on October 25, 1950, he saw the barrel and a change had taken place, in that a seal had been placed around the cap and the spigot of the drum. There is no explanation in the record as to who placed the seal or the reason therefor, and it is apparent that while the witness testified the drum was in his custody, he himself not knowing who placed the seal on it would indicate that there was no actual custody of the drum by any person and that the same was accessible to others.

The cases cited by the plaintiff with regard to explosions resulting from adulteration of petroleum fuels are cases in which immediately after the explosion or fire the fuel was suspected and steps were taken to investigate, inspect or test the same, and there was little, if any, delay. Here we have a different situation, for as we gather from the record no one suspected the explosion resulted from any adulteration of fuel.

Clayton A. Garner, assistant fire chief of the East Base Fire Department, testified that he had a conversation with the plain-

tiff at the hospital at approximately 9:00 a.m. on October 1, 1950, in which he asked the plaintiff if he cared to tell him what happened; that the plaintiff then said: ''That it was getting chilly in the trailer house so he got up to put some fuel oil in the fuel stove, or in the oil stove, and he took the can and filled up the tank on the oil stove. He then went around to the front of the stove and opened up the fire box door, and when he opened the fire box door the flame went out.''

From this statement made by the plaintiff to the assistant fire chief on October 1, 1950, that officer apparently did not suspect adulterated fuel as the cause of the fire because no steps were taken to investigate the fuel at that time.

Counsel insist that at the time of this conversation, being within a few hours after the accident when the plaintiff was lying in the hospital painfully burned, the plaintiff would not have been in a position to know what he was saying, and it is true that plaintiff testified that he did not recall any such conversation. Considering his state of mind and painful injuries at that time, this could very well be true, but the evidence of the assistant fire chief is credible, and it was his duty to investigate the cause of the fire. The doctor in charge of the base hospital testified that the plaintiff was rational the first day following the fire and could be questioned.

It was the burden of the plaintiff to prove the allegations of his complaint, and to be permitted to have the results of tests submitted to the jury he must carry his burden of proving that the liquid tested was the same liquid sold to him by the defendant on June 29, 1950.

Plaintiff cites many cases where the results of tests of petroleum products have been admitted, but in all such cases adulteration or contamination of the fuel was suspected, samples promptly obtained and steps taken with rapidity to have tests made before any appreciable period of time had elapsed. Typical of these is Goode v. Pierce Oil Corp., 171 Ark. 863, 286 S.W. 1009, where as pointed out in the statement of facts, ''Some of the oil remained in the can after the explosion. It was exam-

ined by a chemist, and found to be a mixture of gasoline and kerosene."

In Rife v. Gafill Oil Co., 235 Mich. 15, 209 N.W. 172, the proof showed that the test was made from a sample taken from the defendant's tanks and that no change had been made in those tanks between the sale and the securing of the sample.

In Farrell v. G. O. Miller Co., 147 Minn. 52, 179 N.W. 566, an examination of the can containing the fuel was made the morning following the accident and liquid found there was submitted for examination.

The cases having to do with fires and explosions as the result of contaminated fuel all exhibit the same features, fire or explosion very shortly after acquisition of the fuel, examination and test of the fuel very shortly after the accident. Such does not appear in this case. Here we have a purchase of fuel months before the fire, use without trouble thereafter, and following the fire, a delay of over three weeks before any examination was made of the fuel, and no proof that the fuel sample was the same fuel as used on the day of the fire.

In dealing with experiments and tests, "The burden is on the party offering the evidence to show similarity in essential condition, and preliminary proof of identity of conditions should, of course, be received. It is for the court to determine whether the conditions are sufficiently similar to warrant admission of the evidence." 32 C.J.S. Evidence, section 590, page 443.

"Generally, the burden is upon the party offering the evidence to show sufficient similarity of conditions. This is especially true where, as here, the evidence is strongly favorable to the party offering it. 22 C.J. 758; R.C.L. 1002. Enghlin v. Pittsburgh [County R.] Co., 169 Okl. 106, 36 Pac. (2d) 32, 94 A.L.R. 1180." Skelly Oil Co. v. Jordan, 186 Okl. 130, 96 Pac. (2d) 524, 525. This rule was followed in Champlin Refining Co. v. Smith, 190 Okl. 287, 123 Pac. (2d) 253, in which case a nine-month period existed between the damage and the test.

To sum the matter up: "Where a situation is transitory, evidence of the condition of things a considerable time after the happening of an event is excluded as evidence of the condition at the time; but where, from the nature of the situation, the condition is of such a permanent character that the lapse of time would not make material difference, and it would be improbable that change had occurred, testimony as to conditions after the happening of an event is relevant to show the conditions existing at the time. This is especially true where a permanent structure is involved which would not be apt to change." Johnson v. Charles William Palomba Co., 114 Conn. 108, 157 A. 902, 904, 80 A.L.R. 441.

For these reasons the rulings of the trial court were correct with respect to these offers.

Specification of error 20 is directed to the admission in evidence of Farmers Union Exhibit T, being a supervisor's report of accident prepared by various personnel at the Great Falls Air Force Base. The foundation for the admission of this exhibit was that it was prepared by the authority of Air Force Regulation 32-2, dated December 15, 1948. It was prepared in several sections, the first five sections prepared by the individual's supervisor or the engineering supervisor. Copy of the report was furnished the witness, James L. Dickson, the ground safety inspector.

The supervisor of the plaintiff on October 1 was Captain Gordon J. Andrews, and the report was signed by him. The regulations require that section six of the report be prepared by the officer next over the supervisor and this officer was Colonel Gerald Hoyle who had also signed the report. Upon receipt of the report the procedure is that the ground safety officer make remarks on the reverse side, which the witness Dickson did and signed it. The offered exhibit is a carbon copy and not authenticated in any manner. Upon this foundation the exhibit was offered in evidence.

The objection was that it was completely hearsay; that there was no opportunity to cross-examine any of the witnesses whose

names were mentioned in it; that the report bore date of October 4, 1950, and in paragraph six of the report it stated that the subject officer, being the plaintiff, could not be interviewed until October 9th, being five days after the report was made; that not only did the report itself indicate that there was no contact with the plaintiff, but also every entry in the report was hearsay.

To this objection the court responded: ''Well, it is a federal document. It may be introduced.'' Further objection was made that it was not the original, to which the court responded: ''It may be introduced.''

Plaintiff contends that reports of public officers or employees relating to the cause of, or responsibility for injury to persons or damage to property should not be admitted for the reason that such determination is a statement of opinion, and that since those who prepared the report would not be permitted to state their opinion, if on the witness stand, there is all the more reason for excluding the statement of opinion when those who prepared the report are not under oath and not subject to cross-examination.

Defendant, Farmers Union Oil Company, contends the exhibit is permissible as a report made in the regular course of business under the provisions of R.C.M. 1947, sections 93-801-2 and 93-801-1, which read:

''A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.'' Section 93-801-2.

''The term 'business' shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not.'' Section 93-801-1.

That the court did not have these sections in mind is appar-

ent from the record since the court mentioned that it was a federal document as the reason for permitting its admission.

It is to be noted that section 93-801-2 provides that a record shall be competent evidence "if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." Under this wording it would become incumbent upon the court to require, as part of the foundation, evidence to that effect, and such evidence was lacking at the time of the offer. Upon cross-examination of the witness, James L. Dickson, who produced the exhibit, it developed that he had signed the same because the report appeared to be in proper order to him; that he had not interviewed the plaintiff, nor had anyone else to his knowledge; that so far as the information contained in paragraphs one to six, inclusive, of the report, he could not tell where the information came from. Dickson also stated that the information contained in paragraphs one to six and seven would have been filled out by Gordon J. Andrews and Gerald Hoyle, but that he did not know what part of the report either or both of them had filled out. The following question was asked the witness Dickson: "Q. Do you know whether or not either of them ever personally investigated the cause of the fire?

"Mr. Cure: To which we object as immaterial.

"Court: The instrument speaks for itself.

"Mr. Maury: Is there no such thing as conclusive evidence in this state, Your Honor?

"Court: I don't know as this man knows anything about it."

Plaintiff's counsel was endeavoring by cross-examination to determine if the necessary foundation existed in accordance with the provisions of R.C.M. 1947, section 93-801-2, to vouch for the authenticity of the instrument, which should have been done prior to admitting it in evidence.

Following the admission into evidence of Farmers Union Exhibit T, Colonel L. J. Northington identified Farmers Union Exhibit V as having been prepared under air force regulations by Fire Chief William H. Mason. Mason identified Farmers

Union Exhibit V as having been prepared under his direction under air force regulations by Assistant Fire Chief Clayton A. Garner.

Mr. Garner was called as a witness and testified that he prepared Farmers Union Exhibit W in the first instance from which Farmers Union Exhibit V was later prepared. Both Exhibits V and W contain this statement: ''Lt. Richardson was filling supply tank on oil heater that was nearly out of fuel. After the tank had been filled, the door to the fire box was open, causing flame to go out. The hot fire box was flooded with fuel, causing explosion and fire.''

On cross-examination Garner testified that in the interview which he had with plaintiff, he did not get the information written by him in the exhibit, which was that ''The hot fire box was flooded with fuel causing an explosion and fire.''

As a basis for preparation of Farmers Union Exhibit T, Farmers Union Exhibits V and W⁰ were used. In Farmers Union Exhibit T the description of what occurred is as follows: ''Subject officer was refueling an oil heater in his privately owned trailer. The heater was hot but not burning. As the fuel came in contact with the hot burner it vaporized and filled the trailer. The heater was sufficiently hot to ignite the vapors thus causing an explosion and fire.''

In the original instance it would appear that in the preparation of Farmers Union Exhibit W, Clayton A. Garner was expressing his opinion and conclusion as to how the fire occurred when he placed the wording that he did in the exhibit. This opinion was carried forward by his immediate superior, and so on up the line until the final preparation of Farmers Union Exhibit T, in which exhibit further opinions and conclusions have been inserted by whoever prepared that report.

Thus by the use of Farmers Union Exhibit T, the defendant placed before the jury the fact that the fire box was hot at the time that the plaintiff had turned on the valve and allowed the burner fuel to flow into the heater pan, which information admittedly was not obtained from the plaintiff by the person

who originally commenced the train of reports which were the foundation for the preparation of Farmers Union Exhibit T: In the preparation of said Exhibit T, the wording of the foundational reports was not used; whoever prepared that report expressed therein the opinion that the fuel vaporized and filled the trailer, and that the heater was sufficiently hot to ignite the vapors thus causing the explosion and fire.

From the record it does not appear that anyone connected with the preparation of this report was an expert on petroleum fuels and their tendencies, but their conclusions established the cause of the explosion. It is apparent that the sources of information were not sufficient to justify its admission in evidence.

Defendant contends that under sections 1732 and 1733 of Title 28, U.S.C.A. this exhibit was admissible, but whatever might be the rule in federal courts would not apply to our courts.

This exhibit was not admissible under the Uniform Official Reports as Evidence Act, R.C.M. 1947, section 93-901-1, because it was not prepared by an officer of this state. We think Exhibit T was erroneously admitted and we do not believe that the plaintiff is precluded from urging this error because after his objection to its admission had been overruled he further questioned the witness in order to show that the exhibit was hearsay and therefore inadmissible.

This court stated in First Nat. Bank of Reeder, N. D. v. Middleton, 61 Mont. 209, 213, 214, 201 Pac. 683, 684:

''On the other hand, we find it strongly, and, we thing properly, laid down that plaintiff's position herein is correct. 'Nor can it matter, in the result, that the defendant's counsel, on cross-examination, asked the witness to repeat his account of the interview with the conductor. That course did not amount to a waiver of the right to urge the exception already saved to the ruling of the court in admitting the interview. Counsel might properly conform to that ruling for the purposes of the trial, without thereby waiving the right to review the admission of incompetent evidence that had come in, over his objection.

After that evidence was before the jury, he might then combat it or meet it, as best he might, without waiving the exception already taken. Barker v. St. Louis, I. M. & S. R. Co., 126 Mo. 143, 28 S.W. 866, 26 L.R.A. 843, 47 Am. St. Rep. 646, and cases cited.

" 'Where an exception is duly taken to the admission of illegal testimony, it is not waived by mere cross-examination of the witness respecting it.' Marsh v. Snyder, 14 Neb. 237, 15 N.W. 341.

" 'There are cases holding that objections to testimony are waived when the objecting party on cross-examination subsequently goes into the same matter, but this is clearly against the weight of authority. It would indeed be a strange doctrine, and a rule utterly destructive of the right and all the benefits of cross-examination, to hold a litigant to have waived his objection to improper testimony, because, by further inquiry, he sought on cross-examination to break the force or demonstrate the untruthfulness of the evidence given in chief, in the event, as would most usually occur, that the witness should on his cross-examination repeat or restate some or all of his evidence given on his direct examination.' 26 R.C.L. Trial, 1052; Cathey v. Missouri, K. & T. Ry. Co., 104 Tex. 39, 133 S.W. 417, 33 L.R.A., N.S., 103, and note."

Neither is plaintiff precluded by allowing Farmers Union Exhibits V and W to be received in evidence without objection since they further indicated the hearsay, evident in Farmers Union Exhibit T. Since it is held that such error is not cured by the objecting party offering evidence in rebuttal, 5 C.J.S. Appeal and Error, section 1735; In re Boyes' Estate, 151 Cal. 143, 90 Pac. 454; Short v. Frink, 151 Cal. 83, 90 Pac. 200, we feel that the statement appearing in Georgia Ry. & Electric Co. v. Wallace & Co., 122 Ga. 547, 50 S.E. 478, 480, "nor was this error cured because the defendant endeavored to meet the necessity thus improperly imposed," is particularly applicable.

As was said in Lincoln Taxi Co. v. Rice, Ky., 251 S.W. (2d) 867, 869: "Here the appellants were put in an unfavorable

position by reason of the admission of the testimony as to the arrest, and they should not be precluded from relying upon that error merely because they sought to minimize the prejudicial effect of the testimony by showing that the arrest did not result in a conviction. It is stated in 5 C.J.S. Appeal & Error, section 1735c, page 1019, that an error in admitting evidence is not cured by the offering of evidence in rebuttal thereof by the objecting party.''

Specification of error 1 contends error in the giving of an instruction defining contributory negligence. Since the facts referred to in the instruction are based upon information taken from Farmers Union Exhibit T, upon which we have already ruled, there is no necessity for further considering the instruction since that matter would not arise upon another trial.

Specification of error 2 contends error in instructing the jury with regard to presumptions. The court's instruction being in these words:

''You are instructed that a presumption is a deduction which the law expressly directs to be made from particular facts. A presumption, unless declared by law to be conclusive, may be controverted by other evidence, direct or indirect; but unless so controverted, the jury are bound to find according to the presumption. Among the presumptions which our law recognizes is that the law has been obeyed and that a thing once proved to exist continues as long as is usual with things of that nature. However, this latter presumption does not operate backwards. Presumptions cannot be reversed. No presumption is to be inferred from a fact that a condition exists at a particular time that it existed in the past.''

It is unnecessary to discuss this matter further by reason of what has been said heretofore. The instruction was properly given.

Specification of error 3 contends error in the following instruction given by the court to the jury over the objection of the plaintiff:

''You are instructed that the question as to whether or not

the Farmers Union Oil Company has any insurance is not involved in this law suit. Referring to the Defendant's Exhibit 'R' there is contained therein a reference or statement to the effect that the Farmers Union Oil Company does have some insurance. Such a statement is wholly incompetent to prove insurance, even if insurance were an issue in this case, and you may not in your deliberations assume, from such statement that the Farmers Union Oil Company does have any insurance.''

This matter was injected into the case during the cross-examination of the witness Portz, one of the plaintiff's witnesses. Counsel for defendant, Farmers Union Oil Company, had the witness identify a letter received by him from a representative of the defendant, Phillips Petroleum Corporation, and thereupon offered the letter in evidence. No objection was made to its admission. The letter contained this wording: ''* * * should allow Richardson to recover a money judgment against Farmers Union, who we understand, has large insurance coverage for such cases * * *.'' In their offer no effort was made to delete this language nor was any reservation made of any part of the letter.

"Evidence once offered and admitted cannot ordinarily be *withdrawn* by the offering party, even by allowance of the Court, without consent of the opponent,—at least, merely because the offering party changes his mind about using it.'' 1 Wigmore on evidence, section 17c, page 321. Further in considering the same situation it is said: ''* * * the motion or instruction comes too late, if the ground of it was knowable at the time of the offer of the testimony.'' Id. at section 19 (2d), page 353.

"When testimony comes in without objection, it becomes a part of the record, and the party who offers it cannot deprive his adversary of the benefit of such testimony.'' Alabama Great Southern Ry. Co. v. Hardy, 131 Ga. 238, 62 S.E. 71, 72.

"Objections to evidence cannot, as a general rule, be made by a *motion to instruct* the jury to disregard the particular evidence. It has been well said: 'To allow a party to permit, without objection, the admission of evidence, and for the first

time make his objection in instructions, would be intolerable practice. If he had an opportunity to interpose an objection, he cannot take the chances that the testimony will be favorable to him and, when it turns out otherwise, raise his objections; but must be held to have *waived* it.' [Maxwell v. Hannibal etc. R. Co., 85 Mo. 95, 106]'' 1 Thompson on Trials, section 700, page 638.

Since the same situation would prevail where a party offered the evidence, as in this case, the instruction should not have been given.

For the foregoing reasons the judgment of the district court is reversed and the cause remanded for a new trial.

MR. JUSTICES BOTTOMLY, ANGSTMAN and ADAIR, concur.

MR. JUSTICE CASTLES, concurs in the result but not all that is said.