No. 12577

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

FRED PESSL,

Plaintiff and Respondent,

-vs-

BRIDGER BOWL, a Montana corporation,
and RIBLET TRAMWAY COMPANY, a corporation,

Defendants and Appellants.

---

Appeal from:  District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Poore, McKenzie and Roth, Butte, Montana
Allen R. McKenzie argued, Butte, Montana
Berg, O'Connell, Angel and Andriolo, Bozeman, Montana

For Respondent:

Bolinger and Wellcome, Bozeman, Montana
Page Wellcome argued, Bozeman, Montana

---

Submitted:  May 20, 1974

Decided:  JUL - 9 1974

Filed:  JUL - 9 1974

Thomas J. Kearney
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment against defendant and from an order denying motions for a new trial and judgment notwithstanding the verdict. The case was tried in Gallatin County before a jury.

Plaintiff Fred Pessl brought action against Bridger Bowl, a Montana corporation, and Riblet Tramway Company alleging their negligence caused an accident and injury sustained by plaintiff on February 22, 1972. Plaintiff also asserted a claim based on the doctrine of strict liability and breach of implied warranty as to Riblet Tramway Company and a claim relying on the doctrine of res ipsa loquitur as to Bridger Bowl.

Defendants answered generally denying all allegations. The district court dismissed the action as to defendant Riblet Tramway Company and no appeal is involved with Riblet. The jury returned a verdict against defendant Bridger Bowl in the amount of $30,886.90.

As plaintiff, who was skiing at Bridger Bowl as a season ticket holder which entitled him to ride all lifts, was proceeding up the Bridger chair lift there was a sudden swirl of snow and increase in the wind at a point 40 to 50 feet from Tower 3. The cable holding the chair derailed from the sheave wheels on Tower 3 causing plaintiff's chair to drop to the ground, rebound and throw plaintiff to the ground. Plaintiff was 71 years old at the time. He was severely injured.

Defendant Bridger Bowl operates a recreational ski area, including four lifts. The area is operated under a special use permit from the United States Forest Service and is subject to its regulations and inspection. The area is inspected each year and had been approved for the 1971-72 ski season.

On February 22, 1972 plaintiff had been skiing in the morning. After lunch the wind picked up so that skiing was not too pleasant on the Alpine lift where he had been skiing. He decided

to go to Deer Park lift which is a more protected area. To get to that area he used the Bridger lift. The wind was stronger and drifting or blowing snow was noticeable. The Deer Park lift had been shut down because of the high wind.

On that day the Bridger lift was being operated in spite of prior notice of a malfunction of a derail circuit switch. The failure of this switch to operate would have either an accelerative or dampening force on the velocity with which the cable would rebound.

Investigation of the accident was conducted on February 23, 1972 by Ross MacPherson and Leroy Schultz, United States Forest Service employees, and by Emil Cochand, Wes Hayes and George Rule, employees of Bridger Bowl. A written report was submitted by Bridger Bowl to the State Aerial Tramway Board. The Bridger employees found no defect in the lift and specifically no defect in or misalignment of the sheave wheels located at Tower 3 requiring repair or replacement.

MacPherson was the Forester in charge of the area. Schultz was Regional Ski Lift Engineer responsible for ski areas. MacPherson was at the site of Tower 3 but remained on the ground at the time of the investigation. Schultz went up the tower with Bridger Bowl employees and inspected alignment and condition of the sheave wheels. Schultz prepared an accident investigation report which was, in part, admitted into evidence. More will be said later concerning this report.

The issues on appeal are:

1. Admissibility of a forest service report.

2. The duty of care owed to plaintiff.

3. Instructions given and refused.

Bridger Bowl submitted a written report to the State Aerial Tramway Board dated February 24, 1972. That report stated: "Derailment due to wind (twister)." and "wind was only cause of deropement." Neither Forester MacPherson nor Bridger Bowl employees Cochand, Hayes or Rule discovered any defect in the lift and specifically no defect in or misalignment of the sheave wheels located at

Tower 3, requiring repair or replacement. MacPherson, for the Forest Service, authorized resumption of operation of the lift the day following the inspection without change or restriction.

A review of the testimony shows clearly that plaintiff endeavored to show negligence on the part of Bridger Bowl by a showing that deropement was caused by misalignment of the sheaves carrying the cable at Tower 3. Plaintiff's witness Sowder, an official of Riblet Tramway Company, testified to the effect that a misalignment of the sheaves of three inches would have an effect which would result in the cable coming out of the sheave easier. To establish that this misalignment condition existed at the time of plaintiff's accident, plaintiff relied on an undated accident investigation report signed by Schultz, the Forest Service Regional Ski Lift Engineer.

Plaintiff first attempted to introduce the evidence through witness Cochand, Bridger Bowl's manager. The court sustained an objection that the evidence was an interoffice memorandum and report between one department of the Forest Service and another and was hearsay and incompetent. Plaintiff's next effort was to inquire about the reports from Sowder and again the court sustained Bridger Bowl's objection on the grounds that the report was hearsay; lack of opportunity to cross-examine and, that the testimony sought would be prejudicial on a primary issue of the case. Plaintiff's third attempt was ultimately successful and the report was admitted on the basis of a foundation laid through MacPherson.

At the first attempt by plaintiff to introduce the report, counsel for Bridger Bowl conceded that the copy of the report was a true and accurate copy, but that was all. Plaintiff sought to introduce it under the Uniform Business Records as Evidence Act, section 93-801-2, R.C.M. 1947. To give a word picture of the situation, we quote excerpts of testimony regarding the report:

> "MR. WELLCOME: We will offer in evidence, Your Honor, Plaintiff's Exhibit 15, under the Uniform Business Records, as evidence, Act.

- 4 -

"MR. McKENZIE: May I voir dire?

"THE COURT: Yes, you may.

"MR. McKENZIE: Mr. MacPherson, you have testified that you were present during the course of the investigation. You did not prepare this report; did you?

"THE WITNESS: No.

"MR. McKENZIE: And as a matter of fact this report was sent directly to and was a part of the files of the regional office in Missoula; is that true, sir?

"THE WITNESS: Yes.

"MR. McKENZIE: You did not ever see this report until about two days ago; is that correct, sir; or, three days ago?

"WITNESS: Yes; last week sometime.

"MR.McKENZIE: Yes. So this report and the information contained therein can not be authenticated by you from your personal recollection or knowledge gained in the course of the investigation; isn't that true?

"MR. WELLCOME: I object to that question, if it is on voir dire. That is not an element of the Uniform Business, as records evidence Act.

"THE COURT: Overruled. You may answer.

"THE WITNESS: Would you try that again.

"(Reporter read last question.)

"THE COURT: I am letting this in on the basis of source of information under the Uniform Business Records. All right.

"THE WITNESS: I really don't understand it, the details of the question. I stayed down on the ground and Schultz went up on the lift with Bridger Bowl's man and made the inspection.

"MR. McKENZIE: So, any comments as to what were observed there that are contained in this report are solely history, and you cannot testify to such information from your own personal knowledge or observation?

"THE WITNESS: That's right.

"MR. McKENZIE: And as a matter of fact as you have testified, you are not the custodian of this particular record, are you, sir?

"THE WITNESS: No.

"MR. McKENZIE: The custodian is in Missoula?

"THE WITNESS: That's right.
" * * *
"MR. McKENZIE: We will object, if the Court please, on the gound and for the reason that the proposed exhibit is based on hearsay, as to this Defendant. The exhibit

contains information pertinent to a primary issue
in the case. And its admission into evidence would
be prejudicial to the Defendant, Bridger Bowl, on
the ground and for the reason that it would be pre-
vented from cross-examining the author of the report.
And the best evidence, is likewise, the testimony
of the author of the report.

"MR. ANGEL: May I have one question on voir dire?

"THE COURT: Yes, you may.

"MR. ANGEL: In view of the fact that this document
did not reach your files until last week, in the month
of March, 1973, are you really able to say when the
report was prepared by LeRoy Schultz?

"THE WITNESS: No.

"MR. ANGEL: I have no objections, Your Honor, but I
just wanted to find that out.

"THE COURT: * * * Let the record show the jury is
outside the presence of the Court. I will hear you
Mr. Wellcome, on this.

"MR. WELLCOME: Well, Your Honor, my position, simply
stated, is that it is admissible under the Uniform
Business Records Act. We had an attorneys pre-trial
conference the other day and there was never any indica-
tion given to me that I would have to call somebody from
Missoula, who was the actual custodian of this record,
to lay a proper foundation for it. It was my understanding
that there was no problem as to the foundation, and there
could be other objections but not as to the foundation,
that this was a true report and record of the Forest
Service. All of these other objections are being inter-
jected, and I have no opportunity to meet this evidence
because it is a regional thing from the Forest Service
in Missoula. Mr. MacPherson did receive the report and is
a custodian here of the report, and he made the investiga-
tion with Mr. Schultz.

As a matter of fact, may I ask Mr. MacPherson a
couple of questions outside the presence of the jury?

"THE COURT: Yes, you may.

"Q. Isn't it true that you had conversations with Mr.
Schultz pertaining to what he found in his investigation?
A. Yes.

"Q. And didn't he relate to you generally some of the
things that are contained in this report? A. Some of the
things were new to me when I saw it.

"Q. Not the conclusion or anything, but I mean, the
things that he checked and what he did? Not what hearsay
he got, not to whom he talked, but the investigation
generally, didn't he discuss that with you? A. We had
different motives for making inspections. I asked him to
tell me if the lift was safe to operate again to certify
to me it was safe. That is what I was concerned with. At
the end of the day, he told me the lift could be opened to
the public the next day.

"Q. In connection with whether this was prepared immediately or shortly thereafter, isn't it true that you had some knowledge of this report--even if you didn't have a copy--shortly after it was prepared and submitted? A. Yes.

"MR. WELLCOME: Again, Your Honor, I am frankly surprised, and if this is going to be the condition, then I would like to close my testimony and request a continuance to bring somebody from Missoula. But, I didn't think I would have to do that.

"MR. McKENZIE: I raise this point only because this man is not the custodian under the Uniform Business Records Act. The real gist of my objection is that that Act does not allow the introduction of hearsay testimony in the form of an official report based on the statement someone makes who is not available for cross-examination. And that is exactly the philosophy.

" * * *

"BY MR. McKENZIE:

"Q. Mr. MacPherson, this accident investigation report was made to and retained by the chief counsel of the regional office; is that true, sir? A. Correct.

"Q. And this was kept by him, and not made available by reason of requirements concerning possible litigation; isn't that true? A. Yes.

"Q. Now, this report prepared by Mr. Schultz, as you have said, relates to certain findings concerning sheave assemblies, etc., which were not observed by you isn't that true? A. That's right.

"Q. There is a reference here to alignment, checking alignment. Did you personally observe any misalignment of the sheaves from where you were? A. No; I was too far away.

"Q. You were on the ground?"

The edited report of Schultz, disputed Exhibit 15, provides the only basis upon which plaintiff rests his claim that there was a misalignment or defect in the sheave wheels which caused the deropement and supports the version of plaintiff's testimony that the cable merely rolled off the side of the sheave wheels rather than being blown off by the wind. Clearly the report had a prejudicial effect.

Plaintiff argues the effect of the misalignment statements in the report was not prejudicial in any event because there was no proof the misalignment was the cause rather than the result of the deropement. As we have observed heretofore, plaintiff was clearly testifying that the cable merely rolled off the side of the sheave.

Plaintiff further argues that in view of the operation during extreme wind conditions, the absence of cable catchers and non-operation of the derail safety circuit, there was ample evidence of negligence apart from the evidence of misalignment. Perhaps so, but the introduction of the report under circumstances such as here could not help but be prejudicial. All of the persons present at the inspection said there was no misalignment while the report stated there was, and that "The Area [personnel] corrected this alignment in my presence."

As MacPherson's testimony indicates, the report was made for the purpose of possible litigation and retained by the regional counsel for the Forest Service. Plaintiff did not proceed under Rule 36, M.R.Civ.P., and request an admission as to the facts and genuineness of the report by furnishing a copy. Neither a true copy nor the original has ever been made available. What has been expunged and what attachments were eliminated does not appear. Here plaintiff made no showing other than he was producing the altered and expurgated copy of the report which the identifying witness MacPherson had received from its custodian.

It is apparent the report was simply not a business record as contemplated by section 93-801-2, R.C.M. 1947. Nor is it admissible under section 93-901-1, R.C.M. 1947, the Uniform Official Reports as Evidence Act. Richardson v. Farmers Union Oil Co., 131 Mont. 535, 312 P.2d 134. Unsworn reports where there is no right to cross-examine come within the hearsay rule and are inadmissible. Shillingstad v. Nelson 141 Mont. 412, 378 P.2d 393.

The admission of the report over objection was error and requires a new trial.

The second issue on appeal regards the duty of care; that is, whether the status of a ski lift is a common carrier and the duty owed a passenger for hire applies, or whether the duty owed is reasonable care.

The trial court instructed:

"INSTRUCTION NO. 16

"At the time of the accident in question, the
defendant Bridger Bowl was a common carrier
operating a ski lift on which the plaintiff was
a passenger for hire."

"INSTRUCTION NO. 17

"You are instructed that the defendant Bridger
Bowl is a common carrier of persons for reward.
Such carriers are obligated to carry safely those
people who they take onto their transportation
facilities.  To their passengers they owe both a
duty of utmost care and the vigilance of a very
cautious person.  Such carriers are responsible
for any, even the slightest, negligence and are
required to do all that human care, vigilance
and foresight reasonably can do under all the
circumstances."

Bridger Bowl argues that the decision and ruling of the trial

court on the question of the duty of care owed to the plaintiff was

error in that it was in direct conflict first, with the decision

in Brown v. Columbia Amusement Co., 91 Mont. 174, 6 P.2d 874, and

second, the specific language of section 69-6615, R.C.M. 1947, which

is part of the Passenger Tramway Act of 1971.

Brown  followed the law generally as to the duty of an owner

of a place of amusement to his patrons, which was that of reasonable

or ordinary care.  An earlier case, Phillips v. Butte Jockey Club

& Fair Assn., 46 Mont. 338, 127 P. 1011, specifically rejected the

analogy between a passenger of a common carrier for hire and a

patron of an amusement place.

In 1971 the Passenger Tramway Act, sections 69-6601 through

69-6617, R.C.M. 1947, was enacted.  Section 69-6601 states the policy

of the state:

"* * * it shall be the policy of the state to
protect its citizens and visitors from unnecessary
mechanical hazards in the design construction and
operation of passenger tramways, but not from the
hazards inherent in the sports of mountaineering,
skiing and hiking, or from the hazards of the area
served by the skier or other sportsman * * *."

Section 69-6615, R.C.M. 1947, provides:

"Passenger tramways shall not be construed to be
common carrier or public utilities for the purposes
of regulation within the meaning of the laws of
the state of Montana."

Plaintiff argues simply that section 69-6615, R.C.M. 1947, has to do with rate structure and has no limitation upon the construction of a proper legal standard of care which should be applicable to a ski lift. As to section 69-6601, R.C.M. 1947, plaintiff argues he was not injured because of a hazard inherent in the sport of skiing; but rather, he was injured because of negligence in design, construction and operation of the ski lift.

However, the words "unnecessary mechanical hazards" when coupled with these words also appearing in section 69-6601 "The state, through the passenger tramway safety board, shall register all passenger tramways in the state, establish reasonable standards of design, construction and operational practices", establishes a standard of care. (Emphasis supplied.)

The duty is one of reasonable or ordinary care and Instructions No. 16 and 17 should not have been given.

Bridger Bowl also quarrels with Instruction No. 17 in that it goes far beyond the duty of care even for a common carrier. We need not determine this here, but refer to Risken v. Northern Pac. Ry., 137 Mont. 57, 350 P.2d 831.

Plaintiff cites Summit County Development Corporation v. Bagnoli, 166 Colo. 27, 441 P.2d 658, 664, where the Colorado Court said:

> "This is the first occasion we have had to consider the degree of care required of a ski lift operator. We have noted in other jurisdictions where the sport of skiing has also become highly popular, courts have imposed on ski lift operators a common carrier status, thus requiring that a higher degree of care be exercised in the operation of this type of facility. [Citing cases]

> "Because of the existence of the above described rule of Lewis, supra, and the nature and purpose of our statutes pertaining to common carriers at the time of this accident, there was no need to designate the ski lift operator as a common carrier in Instruction No. 15. However, this is of no consequence, since the paramount purpose of Instruction No. 15 was to convey to the jury the rule of law that a chair ski lift operator must exercise the highest degree of care commensurate with the practical operation of the ski lift. It accomplished that purpose. The defendant's contention that the giving of this instruction constituted prejudicial error is rejected."

This case, of course, does not construe Montana's Passenger Tramway Act nor case law on recreational facilities.

The issues concerning instructions have been answered in our discussions heretofore, so we need not discuss them further.

The judgment is reversed and the cause is remanded for new trial.

_Wesley Castles_
Justice

We Concur:

_Jean L. Daly_

_Frank I. Haswell_

_John Conway Harrison_
Justices.