Eric BAYER, Plaintiff–Appellant,

v.

**CRESTED BUTTE MOUNTAIN RESORT, INC., Defendant– Appellee.**

No. 97SA145.

Supreme Court of Colorado,
En Banc.

May 18, 1998.

As Modified on Denial of Rehearing
June 22, 1998.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Purvis, Gray, Schuetze & Gordon, Robert A. Schuetze, Glen F. Gordon, Boulder, for Plaintiff–Appellant.

White & Steele, P.C., Glendon L. Laird, John M. Lebsack, Peter W. Rietz, Denver, for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

Pursuant to C.A.R. 21.1, we agreed to answer the following questions certified to us by the United States Court of Appeals for the Tenth Circuit:

What standard of care governs the duty owed by ski lift operators in Colorado to users of those lifts in the winter season?

Separately, and more particularly, does the Colorado Passenger Tramway Safety Act and/or the Colorado Ski Safety and Liability Act preempt or otherwise supersede the pre-existing Colorado common law standard of care governing the duty owed by ski lift operators to users of those lifts in the winter season?

These questions arise in connection with Eric Bayer's negligence suit against Crested Butte Mountain Resort, Inc. (Crested Butte) involving serious injuries he sustained after falling approximately 30 feet from a ski lift at the Crested Butte ski area.

The federal district court concluded that the Colorado Passenger Tramway Safety Act (Tramway Act) and the Colorado Ski Safety and Liability Act (Ski Safety Act) have substituted a lesser degree of care for ski lift operators than the highest degree of care, thus superseding our holding in *Summit County Development v. Bagnoli,* 166 Colo. 27, 40, 441 P.2d 658, 664 (1968). Based on its ruling that a standard of ordinary care applies, the district court granted summary judgment and dismissed the case.

In answering the certified questions, we reaffirm our holding in *Bagnoli*. A ski lift operator must exercise the highest degree of care commensurate with the lift's practical operation, regardless of the season.

## I.

Eric Bayer, a 19–year–old college student and resident of Florida, was skiing at the Crested Butte ski area· on December 31, 1992. He boarded the Paradise Lift, a double-chair, center pole lift, with a person whom he did not know. This lift was not equipped with restraining devices on the chairs. Bayer rode the Paradise Lift for about 100 yards, lost consciousness, slumped in his chair, and slid feet first to the ground below. He suffered serious and permanent head injuries from the fall. The cause of his unconsciousness remains unknown.

The Passenger Tramway Safety Board (Board), which regulates ski lifts in Colorado, requires the use of restraining devices during summer lift operation but has no companion requirement for winter operation. Bayer does not dispute that Crested Butte complied with applicable Board regulations.

■ The existence and scope of a legal duty of care is a question of law. *See United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo.1992). In *Bagnoli*, we determined that a ski lift operator must exercise the highest degree of care commensurate with practical operation of a lift. *Bagnoli*, 166 Colo. at 40, 441 P.2d at 664. In answering the certified questions, we must determine whether the Tramway Act or the Ski Safety Act, or the two in combination, have modified or preempted our holding in *Bagnoli*.[1]

## II.

■ We hold that the Tramway Act and the Ski Safety Act, alone or in combination, have not preempted or superseded the common law standard requiring a ski lift operator to exercise the highest degree of care commensurate with the practical operation of the ski lift. The General Assembly did not

intend by either act to substitute a standard of care lesser than the highest degree.

Under the Tramway Act, the primary responsibility for the design and operation of ski lifts, consistent with our holding in *Bagnoli*, rests with the operators; the Board is to adopt reasonable standards for the industry, but these are not intended to preclude common law negligence actions or the duty to exercise the highest degree of care. The Ski Safety Act establishes the relative duties of skiers and ski area operators on the ski slopes, limits damage awards, and precludes liability claims resulting from the inherent dangers and risks of skiing, while expressly excluding ski lift accidents from these limitations.

### A.

### *The Highest Degree of Care*

■ A basic proposition of tort law is that the amount of care demanded by the standard of reasonable conduct must be in proportion to the risk; the greater the danger, the higher is the degree of caution which the person owing the duty must exercise. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 208–09 (5th ed.1984). As we said in *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 587 (Colo.1984), "It is axiomatic in the law of negligence that the greater the risk, the greater the amount of care required to avoid injury to others."

■ Our holding in *Bagnoli* squarely placed on lift operators the duty to exercise the highest degree of care consistent with the practical operation of the ski lift because (1) passengers give up their freedom of action and movement, surrendering themselves to the care and custody of the ski lift operator, (2) there is usually nothing passengers can do to cause or prevent the accident, and (3) the operator has exclusive possession and control of the ski lift. *See Bagnoli*, 166 Colo. at 40, 441 P.2d at 664. We derived these factors directly from our prior decision in *Lewis v. Buckskin Joe's, Inc.*, 156 Colo. 46,

---

1. Of course, we do not determine whether Crested Butte breached its duty of care or any other issue remaining in the federal court litigation.

56, 396 P.2d 933, 938–39 (1964), wherein we held that amusement ride operators must "exercise the highest degree of care commensurate with the practical operation" of the ride.[2]

Underlying our adoption in *Bagnoli* of the *Lewis* factors is that ski lifts are operated at considerable height from the ground over rough, elevated, often precipitous Colorado terrain. A fall from the lift can be calamitous. Passengers entrust their safety to the lift operators. Operation of a ski lift thus entails both greater danger and greater responsibility than circumstances involving ordinary care.

In addressing the federal district court's conclusion that the Tramway Act and the Ski Safety Act supersede *Bagnoli*, we first discuss the legislative design and purposes of the two acts.

## B.

*The Tramway Act And The Ski Safety Act*

The statutory canons of construction require us to give effect to the plain meaning of statutory enactments; we must employ rules of grammar and common usage and accord to technical terms and legislative definitions their particular meaning. *See* § 2–4–101, 1 C.R.S. (1997).

The Colorado General Assembly initially addressed ski safety in Colorado through the 1965 Tramway Act. The act's purpose is to assist in safeguarding life, health, property, and the welfare of the state in the operation of passenger tramways.[3] *See* § 25–5–701, 8 C.R.S. (1997). The act establishes a Board "to prevent unnecessary mechanical hazards" and to "assure that reasonable design and construction are used for, that accepted safety devices and sufficient personnel are provided for, and that periodic inspections and adjustments are made which are deemed essential to the safe operation of, passenger tramways." § 25–5–701, 8 C.R.S. (1997). The General Assembly has confirmed that, notwithstanding the powers and duties of the Tramway Board, "[t]he *primary responsibility* for design, construction, maintenance, operation, and inspection *rests with the area operators*" of passenger tramway devices. § 25–5–705, 8 C.R.S. (1997) (emphasis added).

The legislature has empowered the Board[4] with rulemaking and enforcement authority to carry out its functions. The Board is authorized, but not required, to utilize the standards adopted by the American National

---

2. Decided after passage of the Tramway Act based on an accident occurring before its passage, *Bagnoli* has been the law of Colorado for the last 30 years. The Colorado Jury Instructions include the following summary of its holding:

> **12:13 AMUSEMENT DEVICES AND SKI LIFTS—DUTY OF CARE WHERE USER LACKS FREEDOM OF MOVEMENT**
> It is the duty of the (owner)(operator) of an (amusement device)(ski lift) to exercise the highest degree of care a reasonably careful person could exercise under the same or similar circumstances, in keeping with the practical operation of such a device, for the safety of any person using the device with the (owner's)(operator's) express or implied permission. The failure to exercise such care is negligence.

CJI–Civ 3d 12:13 at 98. This instruction is used in ski lift and amusement ride cases and for "those kinds of devices which, to use, the user is required to give up his or her freedom of movement and control of the situation and submit him or herself to the control of the operator." *Id.* at 99. The Instruction's "Notes on Use" state that

neither the Passenger Tramway Safety Act nor the Ski Safety and Liability Act changed the applicability of the instruction to ski lifts, except that a negligence *per se* instruction will be used in cases involving a violation of the Ski Safety Act or regulations of the Board. *See id.* Although the content of a Colorado Jury Instruction is not legally definitive, its long and common usage is persuasive on the matter of being a correct summary of the law. *See Wade v. Olinger Life Ins. Co.*, 192 Colo. 401, 409 n. 7, 560 P.2d 446, 452 n. 7 (1977).

3. A passenger tramway is "a device used to transport passengers uphill on skis, or in cars on tracks, or suspended in the air by the use of steel cables, chains, or belts, or by ropes, and usually supported by trestles or towers with one or more spans." § 25–5–702(4), 8 C.R.S. (1997).

4. The Board is comprised of one member representing the U.S. Forest Service and six members appointed by the governor, two representing the ski industry, two representing the public at large, and two members with experience in the tramway industry, to regulate passenger tramway devices. *See* § 25–5–703, 8 C.R.S. (1997).

Standards Institute (ANSI), *see* § 25–5–704, 8 C.R.S. (1997), and has authority to conduct investigations and inspections, to discipline ski area operators, to issue licenses, to order emergency shut downs, and to engage in other functions related to the purpose of the Tramway Act, *see* §§ 25–5–704 to –716, 8 C.R.S. (1997).[5] The Board by regulation has adopted the ANSI 1992 standards, with some additions, revisions, and deletions. *See* Rule 0.1, 3 C.C.R. 718–1 at 1.

■ Building on the construct of the Tramway Act, the General Assembly followed with the Ski Safety Act in 1979. This act supplements the Tramway Act's focus on ski lifts, but its principal function is to define the duties of ski areas and skiers with regard to activities and features on the ski slopes. *See* § 33–44–102, 9 C.R.S. (1997). In 1990 amendments to the Ski Safety Act, the legislature limited the liability of ski area operators for accidents on the slopes involving the "inherent dangers and risks of skiing." *See* ch. 256, sec. 7, § 33–44–112, 1990 Colo. Sess. Laws, 1543; *see also* ch. 256, sec. 1, Legislative Declaration, 1990 Colo. Sess. Laws, 1540; *Graven v. Vail Assocs.*, 909 P.2d 514, 517–18 (Colo.1995).

Included within the inherent risks of skiing are dangers or conditions that are an "integral part of the sport of skiing," such as weather, snow conditions, collisions with natural and man-made objects, and terrain variations. *See* § 33–44–103(3.5), 9 C.R.S. (1997). The skier must know the range of his or her ability, ski in control, maintain a proper lookout while skiing, avoid collisions with other skiers, and not use a ski slope or trail or passenger tramway while impaired by alcohol or other controlled substances. *See* § 33–44–109, 9 C.R.S. (1997). The statute provides that "no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing." § 33–44–112, 9 C.R.S. (1997). *See also Graven*, 909 P.2d at 518–21.

For their part, ski area operators must maintain a sign system, including signs indicating the level of difficulty of the area's slopes and trails, notices that warn of danger areas, closed trails, and ski area boundaries, and the marking of man-made structures that are not readily visible to skiers. *See* § 33–44–107, 9 C.R.S. (1997). They must undertake safety precautions related to the operation of equipment such as snowmobiles and motorized snow-grooming vehicles on slopes and trails within ski area boundaries. *See* § 33–44–108, 9 C.R.S. (1997).

The Ski Safety Act also addresses aspects of ski lift operation through several provisions which regulate passenger conduct. Passengers must have sufficient physical dexterity to use a lift safely and are required to observe certain conduct when embarking, riding, and disembarking a ski lift. *See* § 33–44–105, 9 C.R.S. (1997). They may not move outside designated areas, throw objects from the tramway, engage in conduct that could cause injury to others, or disobey instructions from the ski area operator. *See id.* On the other hand, ski area operators must maintain a sign system including specific instructions such as "Keep Ski Tips Up," and "Unload Here." *See* § 33–44–106, 9 C.R.S. (1997).

■ Any violation of the statute's provisions applicable to skiers constitutes negligence on their part; in tandem, any violations by a ski area operator of the Ski Safety Act or the Tramway Act constitute negligence as to them. *See* § 33–44–104, 9 C.R.S. (1997). The effect of these statutory provisions is to make violations of the Ski Safety Act and/or Tramway Act negligence *per se.*

C.

*Effect Of The Tramway Act And The Ski Safety Act On The Degree Of Care Applicable To Ski Lift Operators*

■ Of controlling significance in answering the certified questions of law is that we infer no abrogation of a common law right of action absent clear legislative intent. *See Vaughan v. McMinn,* 945 P.2d 404, 408

---

5. The power and duties of the tramway board were specifically enumerated and reorganized into separate sections in the 1993 amendments to the tramway act. *See* ch. 267, secs. 7–8, §§ 25–5–704 to –719, 1993 Colo. Sess. Laws, 1536–44.

(Colo.1997); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 423 (Colo.1991). If the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent "expressly or by clear implication." *McMinn*, 945 P.2d at 408.

Crested Butte contends, and the federal district court determined, that the legislature has replaced the high standard we announced in *Bagnoli* with a standard of ordinary care. In arguing for a duty of care lesser than the highest degree, Crested Butte relies on the 1965 provision in the Tramway Act exempting ski lifts from laws of the state applicable to "common carriers." It also argues, in the alternative, that the "legislature's enactment of a comprehensive statutory and regulatory scheme for safety requirements at ski areas manifests the intent to preempt the field of common law liability, especially where the claim is that a particular safety device was not installed on a lift."

 To the contrary, we conclude that the Tramway Act and the Ski Safety Act, together with the *Bagnoli* standard of care, provide a comprehensive Colorado framework which preserves ski lift common law negligence actions, while at the same time limiting skier suits for inherent dangers on the slopes and defining *per se* negligence for violation of statutory and regulatory requirements.

### 1.
### The Common Carrier Provision
### Of The Tramway Act

The Tramway Act states that:

**Provisions in lieu of others.** The provisions for regulation, registration, and licensing of passenger tramways and the area operators thereof under this part 7 shall be in lieu of all other regulations or registration, or licensing requirements, *and passenger tramways shall not be construed to be common carriers within the meaning of the laws of this state.*

§ 25–5–717, 8 C.R.S. (1997) (emphasis added). [6]

We must read and interpret statutory language in its context. *See* § 2–4–101, 1 C.R.S. (1997) ("Words and phrases shall be read in context."). The phrase concerning common carriers in section 25–5–717 is an integral part of a provision dealing with regulation, registration, and licensing of passenger tramways. Its evident purpose in the context of the "meaning of the laws of this state" is to prohibit any board or agency, other than the Tramway Board, from registering, regulating, or licensing ski lifts. For example, ski lifts are not to be considered common carriers subject to Public Utilities Commission (PUC) jurisdiction. Without this provision, ski lifts arguably would have been under the very broad statutory definition of "common carriers" for regulatory purposes. *See* § 40–1–102(3)(a)(I), 11 C.R.S. (1997).[7]

We did not rely in *Bagnoli* on the notion that ski lift operators are common carriers when enunciating the applicable standard of care. Rather, we applied the *Lewis* factors to ski lift operators because of the degree of control they exercise over passengers, the relative powerlessness of a passenger to secure his or her own safety under the circumstances, and the consequent state of dependence and trust which a passenger must place in the lift operators. In *Lewis*, we said:

*It is not important whether defendants were serving as a carrier or engaged in activities for amusement.* The important factors are, the plaintiffs had surrendered themselves to the care and custody of the

6. Section 25–5–718 was repealed and recodified as section 25–5–717 by the 1993 amendments to the Tramway Act. *See* ch. 267, sec. 8, 1993 Colo. Sess. Laws, 1538 & 1543. The provisions are nearly identical, and we refer to the most recent codification.

7. "Common carrier" is defined in the public utilities statute as: "Every person directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by motor vehicle, aircraft, or other vehicle whatever by indiscriminately accepting and carrying for compensation passengers between fixed points or over established routes or otherwise ...." § 40–1–102(3)(a)(I), 11 C.R.S. (1997).

defendants; they had given up their freedom of movement and actions; there was nothing they could do to cause or prevent the accident. Under the circumstances of this case, the defendants had exclusive possession and control of the facilities used in the conduct of their business and they should be held to the highest degree of care.

*Lewis,* 156 Colo. at 57, 396 P.2d at 939 (emphasis added). One of the justices vigorously dissented as to the degree of care expected, on the basis that "this is not a 'carrier case.'" *Id.* at 72, 396 P.2d at 947 (McWilliams, C.J., dissenting).

In *Bagnoli,* we nevertheless adhered to the basic proposition that enunciating the degree of care to be exercised depends on the danger and degree of responsibility involved. We emphasized that the duty in negligence actions "remains one of exercising due care, and *due care depends upon the attendant circumstances.*" 166 Colo. at 38–39, 441 P.2d at 664 (emphasis added). We held that the attendant circumstances of ski lift operation, like amusement rides, demand the highest degree of care. We pointed out that other jurisdictions had imposed on ski lift operators a common carrier status in requiring the higher duty of care, but that, in Colorado, common carrier status made no difference in this regard in light of the *Lewis* factors. *See Bagnoli,* 166 Colo. at 39–40, 441 P.2d at 664.[8] Thus, in *Bagnoli,* we held that a Colorado jury instruction need not designate a ski lift operator as a common carrier:

Because of the existence of the above described rule of *Lewis, supra,* and the nature and purpose of our statutes pertaining to common carriers at the time of this accident, there was no need to designate the ski lift operator as a common carrier in Instruction No. 15.

*Id.* We said that the inclusion of the "common carrier" description in the actual instruction delivered to the jury in *Bagnoli* was:

of no consequence, since the paramount purpose of Instruction No. 15 was to convey to the jury the rule of law that a chair ski lift operator must exercise the highest degree of care commensurate with the practical operation of the ski lift.

*Id.,* 441 P.2d at 664–65 (emphasis added).

▬ Thus, while common carriers may be required to exercise the highest degree of care towards their passengers, it does not follow that transport device operators who are not classified as common carriers are dispensed from exercising the highest degree of care when the attendant circumstances warrant such caution.

2.

*Legislative Action Subsequent To Bagnoli*

The legislature has carefully chosen how to let stand, supplement, or limit application of the common law in the arena of ski safety; it has chosen not to alter the standard of care applicable to ski lift safety. In 1990, the General Assembly limited the liability of ski area operators for claims involving the inher-

---

**8.** Courts in other jurisdictions have addressed the issue of the duty of care owed by ski lift operators, with widely varying results. Some jurisdictions have stated that ski lifts constitute common carriers for purposes of tort liability. *See Squaw Valley Ski Corp. v. Superior Court,* 2 Cal.App.4th 1499, 3 Cal.Rptr.2d 897, 900 (1992) (ski lift is a common carrier for tort purposes); *D'Amico v. Great American Recreation, Inc.,* 265 N.J.Super. 496, 627 A.2d 1164, 1166 (N.J.Super. Law Div.1992) (ski area operators are common carriers in the operation of ski lifts). *But see McDaniel v. Dowell,* 210 Cal.App.2d 26, 26 Cal. Rptr. 140 (1962) (rope tow not a common carrier for tort liability purposes).

Whether or not they considered ski lifts to be common carriers, courts have differed as to the degree of care ski lift operators must exercise. Some states require the highest degree of care

commensurate with a ski lift's practical operation, *see Hunt v. Sun Valley Co.,* 561 F.2d 744, 746 (9th Cir.1977) (applying Idaho law); *Fisher v. Mt. Mansfield Co.,* 283 F.2d 533, 534 (2d Cir.1960) (applying Vermont law); *D'Amico,* 627 A.2d at 1166–67; *Squaw Valley,* 2 Cal.App.4th 1499, 3 Cal.Rptr.2d at 899–900, and other states require only ordinary care, *see Pessl v. Bridger Bowl,* 164 Mont. 389, 524 P.2d 1101, 1107 (1974); *Bolduc v. Herbert Schneider Corp.,* 117 N.H. 566, 374 A.2d 1187 (1977); *Friedman v. State,* 54 Misc.2d 448, 282 N.Y.S.2d 858, 860 (Ct.Cl.1967).

The question of the degree of care owed by ski lift operators to passengers is grounded in the common law and statutes particular to each state. We look to Colorado law as the basis for our determination that the highest degree of care applies to ski lift operators in this state.

ent dangers and risks of skiing. However, the amendments expressly prevent ski lift operators from claiming that the limitation on a ski area's liability applies to causes of action arising from ski lift accidents. *See* § 33–44–103(3.5), § 33–44–112, 9 C.R.S. (1997).[9] As further confirmation of the intent to exclude ski lift accidents from the liability limitations, the bill's chief sponsor, Representative Scott McInnis, testified that the 1990 amendments to the Ski Safety Act would not affect common law tort liability as it related to ski lifts: "This bill does not exclude a ski area from negligence and the liability it faces with ski lifts." House floor debate on S.B. 80, Mar. 21, 1990.

Another example of the General Assembly's careful distinctions between ski slope and ski lift accident liability is found in section 33–44–113. This provision limits the amount of damages recoverable from a ski lift operator for accidents that occur while skiing but specifically excludes damages "associated with an injury occurring to a passenger while riding on a passenger tramway." § 33–44–113, 9 C.R.S. (1997).[10] Thus, in both a limitation of liability provision and in a limitation of damages provision related to skiing, the General Assembly chose to write an exception preserving the liability and damages law applicable to ski lift accidents.

The legislature has amended the Tramway Act eleven times since the *Bagnoli* decision:

**9.** Section 33–44–103(3.5) provides in pertinent part:

> Nothing in this section shall be construed to limit the liability of the ski area operator for injury caused by the use or operation of ski lifts.

**10.** Section 33–44–113 provides:

> The total amount of damages which may be recovered from a ski area operator by a skier who uses a ski area for the purpose of skiing or for the purpose of sliding downhill on snow or ice on skis, a toboggan, a sled, a tube, a ski-bob, a snowboard, or any other device and who is injured, *excluding those associated with an injury occurring to a passenger while riding on a passenger tramway*, shall not exceed one million dollars, present value, including any derivative claim by any other claimant, which shall not exceed two hundred fifty thousand dollars, present value, and including any claim attributable to noneconomic loss or injury, as defined in sections 13–21–102.5(2) C.R.S., whether past damages, future damages, or a

in 1973, 1976, 1977, 1979, 1983, 1985, 1986, 1987, 1988, 1991 and 1993.[11] None of those amendments altered the ski lift operator liability rules or shifted to the Tramway Board the operator's "primary responsibility for design, construction, maintenance, operation, and inspection." § 25–5–705, 8 C.R.S. (1997). The Ski Safety Act was passed in 1979[12] and substantively amended in 1990,[13] with cross references being made to the Tramway Act. The General Assembly did not choose to overrule *Bagnoli* on either of these occasions.

### 3.
### *Statutory Preemption Of Common Law Causes Of Action And Standards Of Care*

Crested Butte further suggests that the Tramway Act and the Ski Safety Act together manifest the legislature's intent to preempt the field of ski lift safety and, thus, abrogate common law negligence actions and/or the applicable standard of care. Crested Butte insists that the following provisions, which make violations of the Tramway Act and the Ski Safety Act negligence *per se*, replace common law liability except as provided therein:

**Negligence—civil actions ....**

(2) A *violation* by a ski area operator of any requirement of this article or any rule or regulation promulgated by the passen-

> combination of both, which shall not exceed two hundred fifty thousand dollars.
> (Emphasis added.)

**11.** *See* ch. 395, sec. 29, § 66–25–9, 1973 Colo. Sess. Laws 1373; ch. 126, secs. 1–10, 1976 Colo. Sess. Laws 660–63; ch. 354, secs. 1–16, 1977 Colo. Sess. Laws 1288–92; ch. 433, secs. 120–122, §§ 25–5–708 to –710, 1979 Colo. Sess. Laws 1661; ch. 315, secs. 1–7, 1983 Colo. Sess. Laws 1071–73; ch. 101, sec. 23, § 25–5–717, 1985 Colo. Sess. Laws 411; ch. 193, secs. 1–10, 1986 Colo. Sess. Laws 974–78; ch. 172, sec. 83, § 25–5–710, 1987 Colo. Sess. Laws 971; ch. 36, sec. 11, § 25–5–710, 1988 Colo. Sess. Laws 317; ch. 301, sec. 40, § 25–5–710, 1991 Colo. Sess. Laws 1917–18; ch. 267, secs. 1–11, 1993 Colo. Sess. Laws 1532–44.

**12.** *See* ch. 323, secs. 1–3, 1979 Colo. Sess. Laws 1237–44.

**13.** *See* ch. 256, secs. 1–11, 1990 Colo. Sess. Laws 1540–44.

ger tramway safety board pursuant to section 25-5-704(1)(a), C.R.S., *shall,* to the extent such violation causes injury to any person or damage to property, *constitute negligence* on the part of such operator. § 33-44-104(2), 9 C.R.S. (1997) (emphasis added), and,

Inconsistent law or statute. Insofar as any provision of law or statute is inconsistent with the provisions of this article, this article controls.

§ 33-44-114, 9 C.R.S. (1997).

■■■■ We disagree with Crested Butte's proposed construction of these provisions. In section 33-44-104(2),[14] the legislature determined that any violation of the Tramway Act, or Board regulations, would constitute negligence for purposes of a tort suit based on an alleged violation. A statutory provision which defines violation of a statute or rule as negligence *per se* is not necessarily inconsistent with maintenance of a common law negligence action, and the creation of a statutory remedy does not bar preexisting common law rights of action, in the absence of clear legislative intent to negate the common law right. *See McMinn,* 945 P.2d at 408; *see also Trigg v. City & County of Denver,* 784 F.2d 1058, 1059-60 (10th Cir.1986) (in ski lift accident case, both common law negligence and negligence *per se* Colorado jury instructions may be required, if justified by sufficient evidence). We conclude that section 33-44-104(2) demonstrates no indication that the legislature wished to bar, rather than supplement, common law actions in ski lift cases.

Crested Butte contends that the Tramway Act's provisions (1) establishing a Board to "assure that ... accepted safety devices ... are provided for," *see* § 25-5-701, 8 C.R.S. (1997), and (2) empowering the Board to "establish reasonable standards of design and operational practices," *see* § 2-5-709, 8 C.R.S. (1997), necessarily imply that the General Assembly intended to preempt the field of common law liability in ski lift cases. *See Lunsford v. Western States Life Ins.,* 908 P.2d 79, 87 (Colo.1995) (stating that "resort to common law principles is preempted regarding issues to which the ... statute expressly applies or where there are other pertinent statutory provisions. However, if the ... statute is inapplicable and no other applicable statutes exist, we will rely on the common law").

■■■ The primary responsibility for design and operation of a ski lift rests with the operator. The standards adopted by the Board are intended to be reasonable regulatory standards, not to comprise the operator's sole duty in regard to passenger safety. Compliance with these standards is evidence of due care but not conclusive evidence.

In our electricity cases, for example, we have explained that regulatory standards for the safe operation of a dangerous instrumentality do not preclude a finding of negligence under the common law. For example, in *City of Fountain v. Gast,* 904 P.2d 478, 480 (Colo.1995), and *Yampa Valley Electric v. Telecky,* 862 P.2d 252, 257-58 (Colo.1993), we held that, despite the existence of comprehensive National Electric Safety Code standards for the industry, a person may maintain a negligence action against a utility for breach of a common law duty of care. In this state, electric utilities must exercise the highest degree of care to protect the public. *See Gast,* 904 P.2d at 480.

■■■ Evidence of a defendant's compliance with industry standards, while relevant and admissible for determining whether the defendant breached its duty of care, is not conclusive evidence of due care. *See Telecky,* 862 P.2d at 257 (compliance with NESC standards is only a part of the determination that the jury was required to make); *see also Gast,* 904 P.2d at 480 (compliance with NESC standards does not conclusively establish that the highest degree of care was exercised, but is merely one factor to be considered in determining the highest degree of skill and care); *Blueflame Gas v. Van Hoose,* 679 P.2d 579, 591 (Colo.1984)

---

14. Section 33-44-104(2) was amended in 1994 to refer to section 25-5-704(1)(a) of the Tramway Act instead of section 25-5-710(1)(a) because of the 1993 amendments to the Tramway Act. *See* ch. 276, sec. 74, § 33-44-104, 1994 Colo. Sess. Laws, 1644. Because the substance of the section is the same, we refer to the most recent codification.

(compliance with an administrative safety regulation by propane supplier does not conclusively establish that the highest degree of care was exercised, but is merely one circumstance to be considered).[15]

■ Although the *Restatement (Second) of Torts* does not have the force of law, we may look to it as a summary of guiding legal principles. The *Restatement (Second) of Torts* § 288C (1965), supports our conclusion that additional tort remedies remain available despite statutory regulation of an industry: "Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions." In the comment to this section, the Restatement explains that, "Where a statute, ordinance or regulation is found to define a standard of conduct ... the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable man would have taken additional precautions where the situation is such as to call for them." *Id.* § 288C, cmt. a.

We reject Crested Butte's argument that section 285 rather than section 288C of the Restatement should assist our reasoning in this case. Section 285 states that the determination of the standard of conduct of a reasonable person applicable to a given case may be: (a) established by a legislative enactment or administrative regulation which so provides; or (b) adopted by the court from a legislative enactment or administrative regulation which does not so provide; or (c) established by judicial decision; or (d) applied to the facts of the case by the trial judge or the jury if there is no such enactment, regulation, or decision. *See Restatement (Second) of Torts* § 285 (1965).

Crested Butte's analysis fails to account for the logic of section 288C, which states that a standard of conduct defined by statute, ordinance, or regulation as described in section 285 is normally a "minimum standard," and does not prevent a finding that a reasonable person would have taken additional precautions when the situation requires. *Id.* § 288C.

If Crested Butte could point to some part of the Tramway Board's statutes or regulations which prohibits it from taking additional safety precautions, or a patent conflict preventing utilization of a particular safety device under the circumstances, its argument that Board standards preempt common law negligence actions might have merit. For example, in *Jefferson County School District R-1 v. Gilbert*, 725 P.2d 774, 778–79 (Colo. 1986), we held that a city met its duty of care to make streets safe because it met engineering standards prescribed by statute; the statute specifically prohibited the city from installing a traffic signal unless an intersection met certain criteria. Thus, we held that the city did not have a duty to install traffic devices where the statute specifically prohibited the city from installing them except under certain conditions. Here, although the Board required restraining devices during summer operation and not winter, its regulations did not prohibit operation with restraining devices during winter operation.

Crested Butte also asserts that the *Bagnoli* standard, if it still applies, should be limited to ski lift negligence actions based on operational errors or defects in equipment and not to design of the lift. Although the facts in *Bagnoli* related to operation of the lift in the loading procedure and not the design of the lift, section 25–5–705 of the Tramway Act affirms the ski lift operator's primary responsibility for "design, construction, maintenance, operation, and inspection,"

---

15. In *Pizza v. Wolf Creek Ski Development Corp.*, 711 P.2d 671, 683 (Colo.1985), before the 1990 amendments to the Ski Safety Act, we noted that the risks associated with skiing do not rise to the level of those associated with supplying electricity, operating amusement devices, and selling propane gas. However, in that case we were speaking to the dangers associated with skiing—such as variations in terrain, which skiers can guard against—and not the dangers related to the operation of ski lifts. *See id.* Rather, we stated in *Bagnoli* that the risks associated with operating ski lifts are much like those associated with operating amusement rides and based our conclusion regarding the applicable degree of care on the same factors we discussed in *Lewis*. *See Bagnoli*, 166 Colo: at 40, 441 P.2d at 664.

without restriction to the season of operation. The General Assembly has not stated in this regard that the operator's duty is limited to exercising ordinary care. The *Lewis* and *Bagnoli* factors are applicable to each of these components of ski lift safety, and we hold that the ski lift operator must exercise the highest degree of care in regard to each.

A differential standard between operation and design could discourage lift operators from adopting safer designs. Operators would be held to *Bagnoli*'s higher standard when operating with new safety devices, but a lower standard when choosing to stay with existing equipment. Adoption of Crested Butte's argument that the Tramway Act and Ski Safety Act preempt common law liability would entail no responsibility on the part of ski operators to ensure safe design, other than to comply with the Board's regulations. This notion is contrary to the legislature's intent in assigning the primary responsibility for design to the operators, as well as contrary to a fundamental precept of tort law—that conduct adverse to evolving safety norms should not be rewarded. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 33, at 194–95 (5th ed.1984).

### III.

### *Answers To Certified Questions*

The Tramway Act and the Ski Safety Act do not contain express language or a clear implication to preempt common law actions or the standard of care for ski lift accident cases; rather, they evidence the opposite implication. The legislature's intent in the Tramway Act is to "*assist* in safeguarding life, health, property, and the welfare of this state." *See* § 25–5–701, 8 C.R.S. (1997) (emphasis added). "The primary responsibility for design, construction, maintenance, operation, and inspection rests with the area operators of passenger tramway devices." § 25–5–705, 8 C.R.S. (1997). In the context of common law actions, our role has been to enunciate the degree of care which ski lift operators must exercise. Ordinary care is not applicable; the factors of passenger safety and operator control attendant to operation of a ski lift require the operator to exercise the highest degree of care. The

legislature, despite numerous occasions in the adoption and amendment of the two acts, has not altered the applicability of the *Bagnoli* standard.

We therefore answer the certified questions as follows: we hold that the standard of care applicable to ski lift operators in Colorado for the design, construction, maintenance, operation, and inspection of a ski lift, is the highest degree of care commensurate with the practical operation of the lift. Neither the Tramway Act nor the Ski Safety Act preempt or otherwise supersede this standard of care, whatever the season of operation.

KOURLIS, J., dissents, and VOLLACK, C.J., joins in the dissent.

### Justice KOURLIS dissenting:

Because I do not believe that the common carrier standard of care enunciated in *Summit County Development Corp. v. Bagnoli*, 166 Colo. 27, 33, 441 P.2d 658, 661 (1968), survives the General Assembly's express pronouncements in the Colorado Passenger Tramway Safety Act (Tramway Act) and the Colorado Ski Safety and Liability Act (Ski Safety Act), I respectfully dissent.

### I.

The issues certified to this court by the United States Court of Appeals for the Tenth Circuit are: (1) what standard of care governs the duty owed by ski lift operators in Colorado to winter season lift users; and (2) does the Tramway Act and/or the Ski [Safety] Act preempt or otherwise supersede the preexisting Colorado common law standard of care governing the duty owed by ski lift operators to users of those lifts in the winter season? I would answer the second question affirmatively, and clarify that the standard of care applicable to ski lift operators is one of ordinary negligence, as provided in the two Acts.

### II.

The plaintiff in this case, Eric Bayer, asks Crested Butte to insure him from injury while riding a ski lift, whether or not such

injury was occasioned by negligence through mechanical, design or operational failure of the ski lift. Eric Bayer became unconscious and fell from the lift he was riding at Crested Butte ski area incurring severe injury. Bayer claims that Crested Butte had a duty to exercise "the highest degree of care," and that such level of care would have required the installation of a restraining device on the lift from which he fell. He asserts no other wrongful action or omission by Crested Butte. Bayer concedes that the majority of ski lifts in Colorado do not have restraining devices and are certified for operation without them by the Colorado Passenger Tramway Safety Board (Safety Board). He also concedes that no statute, rule or regulation requires lifts to be equipped with such devices for winter operation. The federal district court granted summary judgment to Crested Butte, ruling that the applicable standard of care was reasonable care and that Crested Butte had exercised such reasonable care in the installation of the lift. On appeal, Bayer continues to argue that under *Bagnoli*, Crested Butte should be held to a higher standard of care than ordinary negligence. In my view, *Bagnoli* has no continuing life in light of intervening legislation; and the appropriate standard of care is ordinary and reasonable care.

### III.

In *Bagnoli*, this court determined that a lift operator was a "common carrier" with respect to the plaintiff and therefore owed the plaintiff "the highest degree of care commensurate with the practical operation of the chairlift." *Id.* at 33, 441 P.2d at 661.

The higher standard of care imposed in *Bagnoli* has traditionally been reserved for inherently dangerous activities. *See Federal Ins. Co. v. Public Serv. Co.*, 194 Colo. 107, 111–12, 570 P.2d 239, 241–42 (1977). Ultrahazardous or abnormally dangerous activities warrant a rule of strict liability. *See Western Stock Ctr., Inc. v. Sevit, Inc.*, 195 Colo. 372, 379, 578 P.2d 1045, 1050 (1978).

The law has held common carriers to the higher standard of care, even though their activities are not necessarily inherently dangerous. The rationale for that higher standard arose out of their acceptance of an unusual responsibility to the public. *See* William L. Prosser, *The Law of Torts* 184 (3d ed.1964). Additionally, burden of proof considerations played a role in the analysis, based upon the fact that a passenger on a mode of transport for hire is not familiar with the instrumentalities and appliances used for transportation and would be disadvantaged if required to prove the specific cause of the accident. *See Denver & R.G.R. Co. v. Fotheringham*, 17 Colo.App. 410, 68 P. 978 (1902).

The common carrier standard of care was initially rejected by this court in *Hook v. Lakeside Park Co.*, 142 Colo. 277, 351 P.2d 261 (1960), as applied to amusement park devices on the theory that the "presumptions or inferences available to a passenger in an action against a carrier are not available" in an amusement park setting. *Hook*, 142 Colo. at 282, 351 P.2d at 265.

The court revisited the issue in *Lewis v. Buckskin Joe's Inc.*, 156 Colo. 46, 396 P.2d 933 (1964), and concluded that amusement park devices should be treated as common carriers [1] because "the plaintiffs had surrendered themselves to the care and custody of the defendants; they had given up their freedom of movement and actions; there was nothing they could do to cause or prevent the accident. Under the circumstances of the case, the defendants had exclusive possession and control of the facilities used in the conduct of their business." *Id.* at 56–57, 396 P.2d at 939. Three members of the *Lewis* court dissented on that point, distinguishing common carriers from recreational providers.

If, indeed, a higher standard of care evolves primarily out of either an inherently dangerous activity or out of a common carrier status, clearly the court in *Lewis* was

---

1. At pages 75–76, the Majority includes a reference from *Bagnoli*, citing *Lewis*, to the effect that the actual common carrier status was not important. In fact, the *Lewis* language was merely clarifying that it was not important to distinguish

between a stagecoach "prepared and maintained by the defendant for the *carriage* or *amusement* of those who pay the required fee." *Lewis*, 156 Colo. at 56, 396 P.2d at 939 (emphasis in original).

relying upon the common carrier analysis, not a conclusion that amusement park devices are inherently dangerous.

And thus, the court came to *Bagnoli*. In *Bagnoli*, the court noted that not all of the factors present in *Lewis* similarly applied to *Bagnoli*, but concluded nonetheless that Summit County Development Corporation was a common carrier and, as such, owed the plaintiff the highest degree of care. The court cited various other states that had similarly imposed a common carrier status on ski lift operators.

The *Bagnoli* rationale turned on the common carrier status of the defendant. The court declared that a "ski lift facility, *like other transportation facilities*, and like the stagecoach amusement ride in *Lewis*, requires the operator to exercise the highest degree of care commensurate with its practical operation." *Bagnoli*, 166 Colo. at 40, 441 P.2d at 664.

However, after we decided *Bagnoli*, the legislative landscape changed around the nation, including in Colorado. The chronology reflects that courts initially defined ski lifts as common carriers, and thereby activated a higher standard of care. Many legislatures, like Colorado's General Assembly, then chose to act and declared that passenger tramways are not common carriers. Following legislative pronouncements that ski lifts were not to be treated as common carriers, other states have retreated from a determination that a higher standard of care applies.

For example, in *Pessl v. Bridger Bowl*, 164 Mont. 389, 524 P.2d 1101 (1974), the Montana Supreme Court concluded that the duty of care owed by ski lift operators in Montana was one of reasonable and ordinary care because of the enactment of Montana's Passenger Tramway Act which, in pertinent part, parallels the Tramway Act before us today.[2] *See Pessl*, 524 P.2d at 1107. *See also Bolduc v. Herbert Schneider Corp.*, 117

N.H. 566, 374 A.2d 1187 (1977)(holding same as *Pessl*, and recognizing that states adopting such statutes typically did so in response to court decisions which imposed a higher degree of care); *D'Amico v. Great American Recreation, Inc.*, 265 N.J.Super. 496, 627 A.2d 1164 (1992)(applying highest degree of care because New Jersey's ski safety act did not include language exempting operators from common carrier status); *Albert v. State*, 80 Misc.2d 105, 362 N.Y.S.2d 341 (N.Y.Ct.Cl.1974)(finding that chairlift operators are not common carriers under similarly worded N.Y. statute); *Friedman v. State*, 54 Misc.2d 448, 282 N.Y.S.2d 858 (N.Y.Ct.Cl. 1967)(same as *Albert*); Donald M. Zupanec, Annotation, *Liability for Injury or Death from Ski Lift, Ski Tow, or Similar Device*, 95 A.L.R.3d 203 (1979). The New Hampshire Supreme Court specifically recognized in *Bolduc* that the legislative decision to remove passenger tramways from common carrier status was in response to court cases like *Bagnoli*. *See Bolduc*, 374 A.2d at 1189.

Hence, other courts around the nation have specifically deferred to the legislative determination that passenger tramways may no longer be treated as common carriers. *Bagnoli* explicitly concludes that lift operators should be treated as common carriers, and such a conclusion is no longer valid. Additionally, the *Lewis* factors relied upon in *Bagnoli* cannot stand as an independent basis for the imposition of a higher standard of care unrelated to common carrier status, because they are merely an articulation of the reasons why common carriers are held to a different standard. Those factors cannot stand alone.[3] Hence, in my view, the legislature has removed the cornerstone of the foundation upon which *Bagnoli* rested. As the California Court of Appeal stated in *McDaniel v. Dowell*, 210 Cal.App.2d 26, 26 Cal.Rptr. 140, 143 (1962), absent classification of a ski lift operation as a common

---

**2.** The Montana court also noted that Montana cases had rejected the analogy between a passenger of a common carrier for hire and a patron of an amusement place. *See Pessl*, 524 P.2d at 1106.

**3.** There is an inference in some of the cases, including *Hook*, that amusement park devices are

inherently dangerous and, thus, possibly deserving of a higher standard of care on that basis. This court has expressly rejected this rationale for ski area operators. *See Pizza v. Wolf Creek*, 711 P.2d 671, 683 (Colo.1985)(expressly rejecting analogy comparing operating a ski area to inherently dangerous activities).

carrier, "[t]here is no other basis for the imposition upon the defendant [ ] of a duty to exercise the utmost care and diligence for the safety of the plaintiff."[4]

### IV.

The accident in *Bagnoli* occurred on April 21, 1962, three years prior to the effective date of the Tramway Act. The court in *Bagnoli* thus did not apply the Tramway Act even though the actual decision was handed down in 1968, after the Act's passage.

On July 1, 1965, the following provision of the Tramway Act went into effect:

> The provisions for regulations, registration and licensing of passenger tramways and the operators thereof under this Part 7 shall be in lieu of all other regulations or registration, or licensing requirements, and *passenger tramways*[5] *shall not be construed to be common carriers within the meaning of the laws of this state.*

§ 25–5–717, 11A C.R.S. (1989)(emphasis supplied).

In answering the questions before us today, the Majority observes that we infer no abrogation of a common law right of action absent clear legislative intent. Maj. op. at 74. I find just such clear legislative intent apparent in the unambiguous language of the Tramway Act. Crested Butte operates ski lifts. Ski lifts are passenger tramways, and under the Tramway Act passenger tramways "shall not be construed to be common carriers." § 25–5–717, 11A C.R.S. (1989).

The legislature expressly decided that ski lifts were not to be treated as common carriers in Colorado. In addition, the legislature implicitly occupied the field by enacting pervasive and comprehensive legislation for safety requirements regarding ski lifts. *See Lunsford v. Western States Life Ins.*, 908 P.2d 79, 87 (Colo.1995)(noting that statutory preemption of areas of the common law may arise expressly or by clear implication).

The Tramway Act is comprehensive in its scope of regulation of Colorado ski lifts:

> In order to assist in safeguarding life, health, property and the welfare of this state, it is the policy of the State of Colorado to establish a board empowered to prevent unnecessary mechanical hazards in the operation of ski tows, lifts and tramways and to assure that reasonable design and construction are used for, that accepted safety devices and sufficient personnel are provided for, and that periodic inspections and adjustments are made which are deemed essential to the safe operations of ski tows, ski lifts and passenger tramways.

§ 25–5–701, 11A C.R.S. (1989).[6]

The Tramway Act further authorizes the Safety Board to "adopt reasonable rules and regulations relating to public safety in the design standards, construction, operation and maintenance of passenger tramways." § 25–5–710(a), 11A C.R.S. (1989). The Tramway Act directs the Safety Board to use general guidelines and standards adopted by the American Standards Association, Inc., *see id.*; and the Act makes the Safety Board responsible for establishing "reasonable standards of design and operational practices." § 25–5–710.1, 11A C.R.S. (1989).

In 1979, the legislature expanded the scope of its pronouncements when it enacted the Ski Safety Act.[7] The express purpose of that

---

4. The California court was concerned with whether a rope tow should be classified as a common carrier, and concluded that it should not. The court was not addressing the import of a statute, because at that time, California had no passenger tramway act.

5. A "passenger tramway" is defined as "a device used to transport passengers uphill on skis or in cars on tracks, or suspended in the air by the use of steel cables, chains, or belts, or by ropes, and usually supported by trestles or towers with one or more spans." § 25–5–702(4), 11A C.R.S. (1989).

6. I also note that emergency shutdown of a passenger tramway is justified only if the lift is shown to be an "unreasonable" hazard, § 25–5–716, 11A C.R.S. (1989), lending further credence to the conclusion that the Tramway Act supplants any elevated standard of care and reestablishes an ordinary standard of reasonable care.

7. In 1990, the legislature amended the Ski Safety Act to clarify the law regarding the duties and responsibilities of skiers and ski area operators and to provide additional protection for ski area operators. *See Graven v. Vail Assocs.*, 909 P.2d 514, 517, 517 n. 3, 524 n. 4 (Colo.1995). None

Act was "to establish reasonable safety standards for the operation of ski areas and for skiers using them." § 33–44–102, 14 C.R.S. (1995).

For purposes of the issue before the court, the Ski Safety Act achieves four results. First, it supplements the Tramway Act and further defines the relative rights and responsibilities of ski area operators and skiers. *See* § 33–44–102. Second, it clarifies that negligent operation of a ski lift is not an "inherent risk of skiing." *Id.* Third, it provides that a violation by a ski area operator of any portion of the Ski Safety Act or of any rule or regulation promulgated by the Safety Board shall constitute negligence. *See* § 33–44–104(2). Lastly, it includes preemptive language as follows: *"Insofar as any provision of law or statute is inconsistent with the provisions of this article, this article controls."* § 33–44–114 (emphasis added).

The cumulative effect of those provisions leaves no doubt as to the legislative intent to set forth the governing law concerning ski area liability: both with respect to operation of ski slopes and ski lifts. The Tramway Act removes ski lifts from common carrier status. The Ski Safety Act incorporates the requirements of the Tramway Act and the Safety Board's regulations and further mandates that inconsistent provisions of the common law are abrogated.

Since the Tramway Act eliminates the elevated common carrier status of ski lift operators as a basis for a higher standard of care, the applicable standard reverts to that of ordinary care. The Tramway Act delegates to the Safety Board the task of establishing reasonable standards of design for ski lifts. The Ski Safety Act warns that failure to comply with any rule or regulation promulgated by the Safety Board shall constitute negligence on the part of the operator. The standard of care owed by ski lift operators to

users of those lifts in the winter season is, therefore, ordinary and reasonable care consistent with the rules and regulations of the Safety Board.[8]

Indeed, not only should this court accede to legislative mandate, but additionally the fixing of an elevated standard of care is without basis in fact or law once the common carrier status rationale is eliminated.

## V.

In the absence of statutory edict, the courts must develop the common law. However, the General Assembly retains the authority to repeal common law rights or duties. *See* § 2–4–211, 1 C.R.S (1997). In determining whether a legislative enactment serves to supplement the common law, or to repeal it, the courts have rightfully proceeded with caution. However, the principle of statutory construction that statutes in derogation of the common law must be narrowly construed should never be invoked to defeat the plain and clear intent of the legislature. *See Martin v. Montezuma–Cortez Sch. Dist. RE–1*, 841 P.2d 237, 251–52 (Colo.1992). Legislative intent that is clearly expressed must be given effect. *See Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo.1992)(finding a clear intent by the General Assembly to change the common law rule and require damages to be set off by certain non-exempt collateral source contributions); *Pigford v. People*, 197 Colo. 358, 360, 593 P.2d 354, 356 (1979)(noting a clear statement of legislative intent to change the common law in order to permit admissibility of certain prior offenses in criminal prosecutions for unlawful sexual behavior).

When the legislature overrules a court decision that does not involve a constitutional issue, the court must comply with the legisla-

---

of the 1990 amendments impact upon the question before us today, although they do further display the legislative intent to limit the causes of action available to skiers against ski areas.

8. I do not believe that the "highest standard of care" is applicable to ski lift operators in the wake of the Tramway Act and the Ski Safety Act. Therefore, I do not reach the question of the interrelationship between compliance with the

statutory and regulatory standards and that elevated standard of care. (Maj. op at 78–79). Further, I do not believe the question is before us as to whether evidence in addition to compliance with applicable standards and regulations should be adduced on the issue of negligence. In answering certified questions, the court should be brief and confine itself to the precise questions propounded. *See In re Interrogatories of the U.S. District Court*, 642 P.2d 496, 497 (Colo.1982).

tive direction. "It is not within the purview of this court to question the legislature's choice of policy." *City of Montrose v. Public Utils. Comm'n,* 732 P.2d 1181, 1193 (Colo. 1987) (recognizing that legislature effectively overruled *City of Montrose v. Public Utils. Comm'n,* 197 Colo. 119, 590 P.2d 502 (1979), with respect to the means by which a utility was permitted to surcharge municipal fees).

It is my view that the Majority is, indeed, declining to recognize the appropriate exercise of legislative authority and policy-making in defining the standard of care applicable to ski lift operators. Hence, I respectfully dissent.

I am authorized to state that VOLLACK, C.J., joins in this dissent.